YELLOWSTONE PIPE LINE COMPANY, A DELAWARE CORPORATION, PLAINTIFF AND RESPONDENT, AND CROSS-APPELLANT,

v.

STATE BOARD OF EQUALIZATION OF THE STATE OF MONTANA; J. F. REID, W. J. WINTERS AND E. J. BYRNE, AS MEMBERS OF AND CONSTITUTING SAID THE STATE BOARD OF EQUALIZATION OF THE STATE OF MONTANA; YELLOWSTONE COUNTY, MONTANA, A POLITICAL SUBDIVISION OF THE STATE OF MONTANA; C. O. THOMPSON AS TREASURER OF SAID YELLOWSTONE COUNTY, MONTANA; AND T. A. COTHRON AS ASSESSOR OF SAID YELLOWSTONE COUNTY, MONTANA, DEFENDANTS AND APPELLANTS, AND CROSS-RESPONDENTS.

OIL BASIN PIPE LINE COMPANY, A DELAWARE CORPORATION, PLAINTIFF AND RESPONDENT, AND CROSS-APPELLANT,

v.

STATE BOARD OF EQUALIZATION OF THE STATE OF MONTANA; J. F. REID, W. J. WINTERS AND E. J. BYRNE, AS MEMBERS OF AND CONSTITUTING SAID THE STATE BOARD OF EQUALIZATION OF THE STATE OF MONTANA; YELLOWSTONE COUNTY, MONTANA, A POLITICAL SUBDIVISION OF THE STATE OF MONTANA; C. O. THOMPSON AS TREASURER OF SAID YELLOWSTONE COUNTY, MONTANA; AND T. A. COTHRON AS ASSESSOR OF SAID YELLOW-

STONE COUNTY, MONTANA, DEFENDANTS AND APPELLANTS, AND CROSS-RESPONDENTS.

No. 10069.

Submitted February 9, 1960. Decided July 26, 1960.
Opinion withdrawn and rehearing granted October 20, 1960.
Decided December 30, 1960.

358 P.2d 55.

George T. Bennett, Edward C. Schroeter, Helena, William J. Speare, Billings, for appellants.

George T. Bennett argued orally for appellants.

Toomey & Hughes, Helena, R. C. Hawley and A. T. Smith, Denver, Colo., for respondents.

Edmond G. Toomey, Michael J. Hughes, A. T. Smith, argued orally for respondents.

MR. CHIEF JUSTICE HARRISON delivered the Opinion of the Court.

In this cause a rehearing was granted and it appearing that the opinion heretofore promulgated herein should be redrafted, the same is hereby withdrawn and the following opinion substituted therefor.

This is an appeal by the State Board of Equalization from a judgment of the district court of the thirteenth judicial district whereby assessments by the State Board of Equalization for ad valorem tax purposes of the property of two oil product pipe line companies, the Yellowstone Pipe Line Company, and the Oil Basin Pipe Line Company, were set aside in part as excessive, discriminatory, and in contravention of the provisions of sections 1 and 11 of Article XII, and section 27 of Article III, of the Constitution of Montana, and in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. The pipe line compa-

nies, hereafter referred to as "Yellowstone" and "Oil Basin", each brought suit to recover taxes paid under protest to the assessor of Yellowstone County, Montana. The causes were consolidated for trial upon stipulation of the parties.

Both pipe line companies appealed from the findings below that their property was correctly placed in Class 7 under section 84-301, R.C.M. 1947, the Montana Classification statute, each contending that its proper classification is Class 4, i. e., "land, town and city lots, with improvements, manufacturing and mining machinery, fixtures, and supplies."

Since November 14, 1954, Oil Basin has been engaged in business as a common carrier, transporting refined oil products from Billings to Glendive, Montana, via an underground pipe line. Its pipe line extends 234.776 miles through Yellowstone, Treasure, Rosebud, Custer, Prairie, and Dawson Counties. Oil Basin also owns personal property used in its business which is located in Yellowstone County, Montana.

Since September 30, 1954, Yellowstone has been engaged in business as a common carrier, transporting oil products between Billings, Montana, and Spokane, Washington. It owns 440.65 miles of 10 inch pipe in Montana, traversing the counties of Yellowstone, Stillwater, Sweetgrass, Park, Gallatin, Jefferson, Broadwater, Lewis and Clark, Powell, Granite, Missoula, Lake, and Sanders; 4.16 miles of 8 inch pipe in Yellowstone County; 4.20 miles of 4 inch pipe in Yellowstone County, and delivery facilities, pump stations, and other property necessary to its business.

In 1955, both Yellowstone and Oil Basin filed reports with the State Board of Equalization wherein the financial condition of each company was shown along with statements showing the mileage of pipe to be found in the various counties and school districts through which the pipe lines pass.

The State Board of Equalization, hereinafter referred to as the Board, considered the property of both Yellowstone and Oil Basin to be "property * * * which constitute a single and con-

tinuous property throughout more than one county'' within the meaning of section 84-901, R.C.M. 1947, and subject to assessment by the Board by virtue of section 84-905, R.C.M. 1947.

The Board then assessed all the properties of Oil Basin at a figure of $3,856,166. From this sum the Board deducted the value of property which had been locally assessed by the county assessors of Dawson and Yellowstone Counties in the amount of $99,750. The remainder $3,756,416 was apportioned among the counties through which Oil Basin's pipe line pass at the rate of $16,000 per mile. In Yellowstone County, where Oil Basin owned 74.374 miles of pipe line, the Board notified the County Assessor that Oil Basin's property in Yellowstone County had an assessed valuation of $1,189,984. Further, the Board classified the pipe line property of Oil Basin as property in Class 7, within the meaning of section 84-301, R.C.M. 1947.

The property of Yellowstone in Montana was assessed by the Board at $8,468,250. From this figure, the Board deducted the value of Yellowstone's property which was locally assessed by the County Assessors of Yellowstone, Gallatin, Lewis and Clark, Missoula, Sanders, Granite, and Sweetgrass Counties in the aggregate of $303,984. The remaining figure, $8,164,266, was apportioned among the counties through which Yellowstone's pipe line passed at the rate of $18,310 per mile for 10 inch pipe, $16,000 per mile for 8 inch pipe, and $7,000 per mile for 4 inch pipe. Yellowstone's property in Yellowstone County was assessed at $513,978. Yellowstone's property also was placed in Class 7 under section 84-301, R.C.M.1947.

Both Oil Basin and Yellowstone applied to the Board for a hearing and petitioned for a reassessment and a reclassification of their respective properties. After a hearing before the Board on September 19, 1955, the Board denied any relief.

Oil Basin's taxes for Yellowstone County were computed at $37,944.01 for 1955. Oil Basin paid one-half of that sum, $18,-

972.01 on November 30, 1955, under protest, claiming that $16,896.94 of that sum was unlawful. Within 60 days after paying such taxes, Oil Basin commenced this action to recover the taxes paid under protest, joining the Board, Yellowstone County, and the Treasurer and assessor of Yellowstone County as parties defendant.

Yellowstone Pipe Line Company's taxes for Yellowstone County were computed at $18,313.39. On November 26, 1955, Yellowstone paid this sum under protest, and within 60 days after such payment commenced this action against the same defendants, claiming that $8,745.36 was excessive and unlawfully demanded.

Both causes were consolidated and came on regularly for trial before the court sitting without a jury on August 27, 1958. The court made findings of fact and conclusions of law and entered judgment in favor of both plaintiffs, from which judgment this appeal followed.

This case concerns itself with one of the most complicated and easily misunderstood aspects of taxation in Montana, that is, the assessment of property. Not only this court, but the courts of many other states have been confronted with the problem of judging the legality of assessment procedures. The Constitutions and statutes of the various states differ with respect to the process of assessment for tax purposes. About the most that can be said is that the Constitutions and statutes of all states forbid discrimination among owners of the same type of property. And whether or not the plaintiffs here have been discriminated against by the State Board of Equalization in the assessment of their property is the basic question on this appeal.

To understand the issues in this case, it is necessary to consider first, the overall status of assessment in Montana, and second, the method of assessment used by the State Board of Equalization with respect to property that extends through more than one county and is subject to original assessment by

the Board pursuant to sections 84-901 and 84-905, R.C.M. 1947.

At the trial in the district court, Mr. Edward J. Byrne, a member of the Board, testified at great length as to the status of assessments generally in Montana. Section 84-401, R.C.M. 1947, requires that all taxable property be assessed at its full cash value. Mr. Byrne testified that for many years there has been a substantial departure from the language of this statute with the result that local property has been and is assessed quite low in many fields. The Board for many years has sought to bridge the gap between assessments among the various counties and has sought to establish some uniformity among the counties. Mr. Byrne stated that the Board, consequently, has been confronted with the alternative of trying to equalize assessments even though the level at which they are fixed is below the statutory requirement of true cash value. As an example of the Board's attempt to unify assessments even though it may result in an assessment lower than true cash value, Mr. Byrne indicated that the Board has promulgated schedules of oil drilling equipment which set forth the value at which various types of drilling equipment should be assessed. These have been distributed among the various county assessors with the result that now most of this property is uniformly assessed.

The situation remains, however, that much property in the State of Montana is placed on the assessment rolls at only a percentage of its true and actual value, in violation of the statute. Mr. Byrne's testimony reveals that the Board has been attempting to raise assessments so that all property will eventually be placed on the rolls at its true cash value, in conformity with the statute. The Board also is attempting to do this fairly and uniformly. Hence, if some property has been assessed at a high percentage of its true cash value, the Board will lower the assessment so that it will approximate the percentage at which similar property is placed on the assessment rolls.

In order to accomplish equalization with respect to property

that is subject to assessment by the Board originally, the Board applies to what it considers the true cash value of such property what is termed an "equalization factor". The equalization factor theoretically represents the percentage of true cash value at which similar property is placed on the assessment rolls.

With this background in mind, let us proceed to consider the method of assessment used by the Board with respect to the properties of the plaintiffs herein. For the sake of clarity, let us break down the process by which the Board reaches the figures which it supplied to the Assessor of Yellowstone County, at which the property of the plaintiffs herein was placed on the assessment rolls. The process can be divided into four stages, assessment, allocation, equalization and apportionment.

*Assessment.*

As shown by the testimony at the trial, the first thing the Board did with respect to both plaintiffs here was to take the information that each company had supplied in their reports and attempt to fix the full and true value of each company as an operating unit. This involves application of what is termed the "unit rule of valuation". The theory of this rule is this: Where property is part of a continuous system which extends through many taxing districts, the proper way to find the true cash value of any part of this property requires that the system as a unit be evaluated. The rationale of this theory is that, where a system is involved, the sum of the value of the parts of the system does not truly represent the total value thereof, and therefore, in order to get a true reflection of the economic value, the system as a whole must be valued as a unit. In order to find the value of the Oil Basin Pipe Line Co. the Board averaged the stock and debt value and the cost of plant and equipment. The stock and debt value was found by adding the value of first mortgage bonds outstanding, the value of sinking fund debentures issued, and the value of Oil Basin's common stock at market value. First mortgage bonds which were due in one year were not included because the

Board felt that they would not contribute to an accurate picture of the value of the company. Capitalization of net operating income was not computed in the average because the company had been in operation for only a short while and the Board felt that no proper annual estimate of income could be made. The cost of plant and equipment, as indicated by the report of Oil Basin to the Board, was averaged. This average of stock and debt value and cost of plant and equipment was $5,072,908. This, in the Board's mind, represented the true and full cash value of all the property of Oil Basin Pipe Line Company.

In finding the unit value of Yellowstone Pipe Line's property, the Board followed a similar procedure. It averaged stock and debt value, 6 percent capitalization of estimated annual income, and the cost of plant and equipment. Stock and debt value was computed by adding the value of common stock at par, the value of serial notes, and by subtracting the sum of over $6 million which the Board felt represented an excessive cost of construction in the light of the fact that Yellowstone had been required to traverse unusually treacherous terrain. By averaging these three elements, the Board estimated the true and full cash value of all Yellowstone's property at $13,-388,747.

*Allocation.*

The term "allocation" as used in this case means the process of attributing to the taxing state the value of a portion of an interstate system for tax purposes. Since Oil Basin's property is located entirely within the State of Montana, no allocation was necessary. But as was said earlier, Yellowstone's pipe line extended through Montana, Idaho, and Washington. With respect to Yellowstone's pipe line therefore, the Board was required to determine what portion of Yellowstone's property is located in Montana. In order to accomplish this the Board averaged three elements: the percentage of Yellowstone's total cost that was expended for its property located

within Montana, the percentage of the total income that was derived in Montana, and the percentage of the total mileage of pipe found in Montana. The resulting average, 85.45 percent was determined to represent the percentage of total value of Yellowstone's entire system which should be allocated to Montana for tax purposes. The Board then merely multiplied the total unit value of $13,388,747 by this percentage and found that value of Yellowstone's property allocated to Montana should be $11,440,684.

*Equalization.*

As has been heretofore mentioned, the Board attempts to make uniform local assessments and to make uniform assessment of property which is subject to original assessment by the Board by applying what is termed an equalization factor to true cash value. This is simply the process of determining that property of a certain nature is generally placed on the assessment rolls at a certain percentage of its true and full value. When other property comes before the Board, it attempts to insure that that property will be placed on the assessment rolls at approximately the same percentage of true and full value.

With respect to Oil Basin, the Board applied an equalization factor to what it had determined to be Oil Basin's true and full value, of approximately 76 percent, thereby determining the value for tax purposes of Oil Basin's property in Montana at $3,856,166. With respect to Yellowstone, the Board applied an equalization factor of approximately 74 percent to what it had determined to be the value of Yellowstone's property in Montana of $11,440,684, so that the value of Yellowstone's property in Montana for tax purposes was determined to be $8,468,250. The Board then subtracted from the full and true value of both systems the value of that property which had been assessed locally. The resulting figure of $3,756,416 for Oil Basin, and $8,164,266 for Yellowstone represents to the

Board's mind, the value of each system in Montana, excluding that property which had been locally assessed.

*Apportionment.*

Section 84-905 provides:

"The board must assess all the properties described in section 84-901, but franchises granted by the United States must not be assessed, the value of such properties for assessment purposes to be determined upon such factors as the board shall deem proper.

"On or before the second Monday in July, the board shall apportion such assessment to the counties in which the properties are situated."

Apportionment, then, means the process by which the Board spreads out the total value of a system among the counties through which the system passes. With respect to both pipe lines here involved, the Board accomplished apportionment by dividing the amount to be apportioned by the miles of pipe. The Board then merely found the number of miles of pipe located in each county and multiplied that figure by the value per mile. In the case of Oil Basin, which has 234.-776 miles of 8 inch pipe and property with a total value of $3,756,416, simple arithmetic determined that the pipe would be rated at $16,000 per mile. Since Oil Basin owned 74.374 miles of pipe in Yellowstone County, that county's share of Oil Basin's property was computed at $1,189,984.

Yellowstone Pipe Line Company was treated similarly, with the exception that it owned three different sizes of pipe. All the pipe was equated to 10 inch pipe and the total unit value allocated to Montana was then apportioned at a fixed rate per mile of pipe. The Board computed that 10 inch pipe would be rated at $18,310 per mile, 8 inch pipe at $16,000 per mile and 4 inch pipe at $7,000 per mile. In Yellowstone County, where Yellowstone owned 22.83 miles of 10 inch pipe, 4.16 miles of 8 inch pipe and 4.20 miles of 4 inch pipe, by apply-

ing these rates the county's apportioned share was determined to be $513,978.

In substance the material allegations of Yellowstone's complaint are:

(1) That the full value of all its pipe line property in 1955 did not exceed the sum of $4,901,300; that the true and full value of its 10 inch pipe line did not exceed $11,000 per mile; that the full and true value of its 8 inch pipe line did not exceed $9,000 per mile; that the full and true value of its 4 inch pipe line did not exceed $4,000 per mile.

(2) That notwithstanding this fact, the Board wrongfully and unlawfully assessed all the property of the plaintiff at a figure of $8,468,250; that the Board wrongfully and unlawfully purported to assess plaintiff's 10 inch pipe at $18,310 per mile, 8 inch pipe at $16,000 per mile, and its 4 inch pipe at $7,000 per mile.

(3) That the assessed valuation was arbitrary and discriminatory and that such properties were assessed at a value far in excess of that at which similar property of other taxpayers was assessed; that the assessment was arbitrary, discriminatory, capricious and unreasonable in that the Board made the assessment by using a fundamentally wrong principle of assessment and failed and neglected to make such assessment upon competent and substantial evidence of value and based such assessment on guess, conjecture and surmise; that the valuations are so grossly in excess of true and full value of said property as to be inconsistent with any exercise of honest judgment.

(4) That the Board acted in excess of jurisdiction in purporting to assess property of an oil products pipe line when there is no authority in law.

(5) That the Board wrongfully and unlawfully, and in violation of section 84-301 classified plaintiff's property in Class 7 under said statute instead of under Class 4, which is the proper and lawful classification.

The material allegations of Oil Basin's complaint are of similar import, with the applicable figures changed.

The court made separate findings of fact, and conclusions of law with respect to each Pipe Line Company's case. Yet the findings and conclusions with respect to each plaintiff are of substantially similar import. The substance of these findings which we deem important to set out here with respect to Yellowstone Pipe Line Company are as follows:

(1) That when the State Board assessed plaintiff's property, it knew that real estate in Yellowstone County and throughout the entire State of Montana was systematically assessed by the county assessors at far less than a true and full value, the state-wide average being 30.55 percent of full and true cash value, the average in the thirteen counties through which plaintiff's pipe line passed, being 32.57 percent and the average in Yellowstone County being 31.5 percent according to the Seventeenth Biennial Report of the State Board of Equalization for the period beginning July 1, 1954, to June 30, 1956; that the schedules promulgated by the State Board for use by county assessors in assessing certain types of property such as motor vehicles, oil field equipment and supplies, livestock, lumber, neon signs, etc., reflected that such property had been assessed from 50 percent to 70 percent of full cash value; that the schedule which concerned oil field equipment listed pipe lines at the value of $1,000 per inch of diameter per mile, which value, had it been applied to the plaintiff's pipe line would have resulted in an assessment one-half as great as that which was actually made by the Board in 1955.

(2) That the State Board, in 1955, attempted to ascertain the respective unit values of all the properties of the Montana-Dakota Utilities Company by averaging its respective stock and debt values and the respective values obtained by capitalization of the average net operating income for a five-year period; that as to the Montana-Dakota Utilities Company the Board applied an equalization factor of 68.26 percent to its unit value;

that the State Board assigned to the 8 inch pipe line of said utility a value of $9,000 per mile; that the Board assessed the oil pipe line of Interstate Pipe Line Company in 1955 by averaging the stock and debt value and the value represented by a five-year average of operating income capitalized at 6 percent; that the Board allocated the Montana portion of Interstate Oil Pipe Line by multiplying the total unit value found as aforesaid by the average of the percentage of gross operating income in Montana to total gross operating income and the percentage of cost of plant in Montana to total cost of plant, and that the State Board then applied an equalization factor of 62.55 percent to reach the assessed value of that pipe line in Montana.

(3) That the valuation placed on plaintiff's property by the Board in the sum of $8,468,250 was arbitrary and discriminatory in that such properties were assessed at a value far in excess of that at which similar properties of other taxpayers were assessed by said Board, and in that such properties were assessed at a valuation grossly in excess of that placed upon other taxable property within Yellowstone County belonging to other taxpayers.

(4) That the allocated value of $18,310 per mile placed on plaintiff's 10 inch pipe was grossly excessive in that said properties were assessed at a greater rate than that used in the assessment in the same year of similar properties of other companies, for example, $9,504 per mile on the 10 inch pipe of one company, and $11,000 per mile on the 10 inch pipe of another; that the pipe of companies other than plaintiff was assessed at values allocated at the rate of $9,000 per mile for 8 inch pipe, and $4,000 per mile for 4 inch pipe, whereas plaintiff's pipe was assessed at $16,000 per mile for 8 inch pipe and $7,000 per mile for 4 inch pipe.

(5) That the assessed valuation placed on plaintiff's property by the Board was unreasonable, arbitrary and grossly excessive in that the Board in making such assessment followed

a fundamentally wrong principle of assessment in intentionally and systematically applying to the true and full value of plaintiff's property, an equalization factor of approximately 74 percent, whereas, it well knew that the county assessors of the thirteen counties wherein plaintiff's property was located, intentionally and systematically have applied an average equalization factor to the true and full value of land and improvements of less than 35 percent.

(6) That the equalization factor assigned to plaintiff's property by the Board was so grossly in excess of that percentage to true and full value which had been assigned to property generally by the county assessors of the thirteen counties as to be inconsistent with the exercise of any honest judgment and resulted in a tax that contravenes the provisions of sections 1 and 11 of Article XII of the Constitution of Montana, which requires uniformity in an assessment and taxation and denied to plaintiff the equal protection of the laws in violation of section 27 of Article III of the Constitution of Montana, and the Fourteenth Amendment to the Constitution of the United States.

(7) That the application to plaintiff's property of an equalization factor or assessment ratio of 48 percent of its true and full value as determined by the State Board of Equalization will result in an assessed valuation higher than that placed by said State Board on other like properties (excepting the property of Oil Basin Pipe Line Company), but that said equalization factor or assessment ratio of 48 percent will effect a substantially uniform rate of assessment, and that said equalization factor or assessment ratio of 48 percent is eminently just and reasonable; that plaintiff's property assessed by the State Board of Equalization should not have been assessed by said State Board at more than $5,345,616 and the assessed value of plaintiff's pipe line property in Yellowstone County, Montana, for the year 1955 should not have exceeded $333,300.

(8) That the State Board classified the pipe line property

of the plaintiff in the amount of $8,164,260 as property in Class 7 under sections 84-301 and 84-302.

The court's findings with respect to Oil Basin Pipe Line Company were substantially the same as those heretofore set out with the exception of the following:

(1) The court found that the assessed valuation of Oil Basin's property of $3,756,416 was arbitrary and discriminatory; that the assessed valuation of $16,000 per mile placed upon the property of Oil Basin by the Board was grossly excessive in that such properties were assessed at a value in excess of that of which other similar properties were assessed, i. e., $9,000 per mile; that the Board followed a fundamentally wrong principle of assessment in intentionally and systematically applying an equalization factor of approximately 76 percent to the full and true value of Oil Basin's property to arrive at the assessed value when the Board knew that the county assessors of the six counties wherein Oil Basin's property was located had intentionally and systematically applied an equalization factor of 37 percent to the true and full value of lands and improvements assessed by them to reach the assessed value; that Oil Basin's property should not have been assessed by the Board at more than $2,347,760, and that the assessed value of Oil Basin's pipe line property in Yellowstone County should not have exceeded $743,740.

At the outset it is apparent that the judgments below are in themselves inconsistent. It was held in each case that the properties of respondents were correctly classified as Class 7 property within the meaning of section 84-301, R.C.M. 1947. But it was also held in each case that the assessments were void because, essentially, they were discriminatory and caused respondents' properties to be placed on the tax rolls at a higher percentage of full and true value than were *land and improvements,* which were placed on the rolls at less than 35 percent of full and true value, and thus are in contravention of the requirements of uniformity in assessment and taxation

as provided for in sections 1 and 11 of Article XII of the Montana Constitution.

It is contended most strongly on this appeal that the application of different equalization factors during the process of assessment to the properties of respondents is· a violation of the requirement of uniformity as set out in sections 1 and 11 of Article XII of the Montana Constitution and a violation of the equal protection clause of the Fourteenth Amendment to the Federal Constitution.

Section 1 of Article XII provides:

"The necessary revenue for the support and maintenance of the state shall be provided by the legislative assembly, which shall levy a uniform rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, except that specially provided for in this article. The legislative assembly may also impose a license tax, both upon persons and upon corporations doing business in the state."

Section 11 of Article XII provides:

"Taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax."

Respondents have cited many cases from other jurisdictions to support their contention. But it must be remembered that it is the Constitution of Montana which is controlling here, and its interpretation is for this court. Interpretation of other state constitutions is not binding upon us in the interpretations of our own Constitution. We may, of course, look to others for guidance, but ours is unique, and our word is final on its meaning.

We have here the duty of construing the meaning of uniformity as set forth in these sections. At the outset, some aspects must be noted which reflect the differences between our Constitution and those of other states.

The rule of uniform taxation *according to value* does not prevail in Montana. Property with the same value, but of different character, need not be taxed the same. Hilger v. Moore, 56 Mont. 146, 182 P. 477. The purpose of the classification statute, as stated in the Hilger case at page 173 of 56 Mont., at page 483 of 182 P., is "to shift the burden of taxes from property, as such, to productivity, or, in other words, to impose the burdens of government upon property in proportion to its use, its productivity, its utility, its general setting in the economic organization of society, so that every one will be called upon to contribute according to his ability to bear the burdens, or as nearly so as may be, and to relieve administrative officers from the apparent necessity of continuing the legal fiction of full valuation in the face of contrary facts."

The many cases from other jurisdictions pressed upon us here are of no more use to us than those presented to the court in the Hilger case. In this respect the court at page 172 of 56 Mont., at page 482 of 182 P., there said:

"Decided cases almost without number have been pressed upon our attention, but they are practically without value in this instance. They construe constitutional provisions altogether unlike our own. Indeed, no other state in the Union has provisions in its Constitution similar to those of ours enumerated above. Some of these may be found in the Constitution of one state; some in another; some of them cannot be found in the Constitution of any other state. A review of these authorities would be a work of supererogation."

The Hilger case remains in full force and effect today, and was recently affirmed in Victor Chemical Works v. Silver Bow County, 130 Mont. 308, 301 P.2d 730.

Nor can the interpretation of the Montana Constitution as stated in Hilger v. Moore, supra, be attacked on the ground that it violates the Equal Protection Clause of the Fourteenth Amendment.

The case of Greene v. Louisville & I. R. Co., 244 U.S. 499, 37 S.Ct. 673, 61 L.Ed. 1280, is heavily relied upon by respondents. In that case the United States Supreme Court was construing the Arkansas Constitution which required, at that time, uniformity of taxation *according to value,* which does not obtain in Montana. And the Supreme Court has subsequently stated that such uniformity restrictions are not to be considered as required by the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution. In Nashville, C. & St. Louis Ry. v. Browning, 310 U.S. 362, 368, 60 S.Ct. 968, 971, 84 L.Ed. 1254, in referring to the Greene case, the court stated:

"This Court has previously had occasion to advert to the narrow and sometimes cramping provision of these state uniformity clauses, and has left no doubt that *their inflexible restrictions upon the taxing powers of the state were not to be insinuated into that meritorious conception of equality which alone the equal protection clause was designed to assure.* See Puget Sound Co. v. King County, 264 U.S. 22, 27, 44 S.Ct. 261, 263, 68 L.Ed. 541." Emphasis supplied.

Similarly, the case of Taylor v. Louisville & Nashville R. R. Co., 6 Cir., 88 F. 350, which is cited in the Greene case, involves an interpretation of the Tennessee Constitution which, at that time, required uniformity in taxation in proportion to value, hence, is inapplicable here.

Respondents also cite Raymond v. Chicago Consol. Traction Co., 207 U.S. 20, 28 S.Ct. 14, 52 L.Ed. 90; Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154; Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340; Bohler v. Callaway, 267 U.S. 479, 45 S.Ct. 431, 69 L.Ed. 745. But in the Nashville case, supra, the court stated, with reference to these same cases: "None denied power to a state to apply different yardsticks to different classes of property."

Respondents cite In re Farmer's Appeal, 80 Idaho 72, 325 P.2d 278; McCluskey v. Sparks, 80 Ariz. 15, 291 P.2d 791; Boonville Nat. Bank v. Schlotzhauer, 317 Mo. 1298, 298 S.W. 732, 55 A.L.R. 489, as arising in states having a state constitutional provision identical with section 11, Article XII of our Constitution.

The Idaho Constitution, considered in In re Farmer's Appeal, supra, does contain a provision in section 5, Article 7 which is similar to section 11, Article XII of our Constitution. But that Constitution does not contain any provision relating to the power of a state board of equalization to adjust and equalize between the classes of property, nor does it contain any express grant such as is found in section 15 of Article XII of the Montana Constitution. Furthermore, the Idaho Constitution contains a provision in section 2 of Article 7, that every person or corporation shall pay a tax in proportion to the value of his, or its property. The Idaho Constitution is substantially different than ours, hence, that case is no authority here.

In McCluskey v. Sparks, supra, an Arizona case where an appeal from a dismissal was before the court, it was stated [80 Ariz. 15, 291 P.2d 793] : "Deliberate and systematic undervaluation of plaintiffs' property at a figure greatly in excess of the undervaluation of other *like properties* amounts to a violation of the Arizona constitution, article 9, section 1, which requires that all taxes 'shall be uniform upon the same class of property within the territorial limits of the authority levying the tax * * *'." (Emphasis supplied.) This case is no authority for the contention that a difference in the valuation between *unlike* properties is a violation of such a provision, which is the crux of respondents' claim here.

Boonville Nat. Bank v. Schlotzhauer, supra, a Missouri case, is likewise no authority here. At the time it was decided, the Missouri Constitution provided, in section 4, of article X: "All property subject to taxation shall be taxed in proportion

to its value." And the Missouri court construed the provision to prohibit classification. It said:

"We have ruled that section 4 of article 10 of the Constitution makes but one class of taxable property." [317 Mo. 1298, 298 S.W. 737].

The question now becomes, can our Constitution be construed to permit the state board of equalization to give special treatment to similar properties, i. e., utilities and pipe line companies, which may result in a higher assessment with relation to true and full value, than that applied to dissimilar property, i. e., town and city lots, with a different character and productivity. If our Constitution is properly so construed, there is no discrimination in violation of the 14th Amendment. In Nashville, C. & St. Louis Ry. v. Browning, 310 U.S. 362, 368, 60 S.Ct. 968, 972, 84 L.Ed. 1254, supra, the Supreme Court said:

"That the states may classify property for taxation; may set up different modes of assessment; valuation and collection; may tax some kinds of property at higher rates than others; and in making all these differentiations may treat railroads and other utilities with that separateness which their distinctive characteristics and functions in society make appropriate — these are among the commonplaces of taxation and of constitutional law. Kentucky Railroad Tax Cases, 115 U.S. 321, 6 S.Ct. 57, 29 L.Ed. 414; Pacific Express Co. v. Seibert, 142 U.S. 339, 12 S.Ct. 250, 35 L.Ed. 1035; Florida Central & P. R. Co. v. Reynolds, 183 U.S. 471, 22 S.Ct. 176, 46 L.Ed. 283; Southern Ry. Co. v. Watts, 260 U.S. 519, 43 S.Ct. 192, 67 L.Ed. 375; Atlantic Coast Line v. Daughton [Doughton], 262 U.S. 413, 43 S.Ct. 620, 67 L.Ed. 1051; Brooklyn & Queens Transit Corp. v. New York, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024. Since, so far as the Federal Constitution is concerned, a state can put railroad property into one pigeonhole and other property into another, the only question relevant

for us is whether the state has done so. If the discrimination of which the Railway complains had been formally written into the statutes of Tennessee, challenge to its constitutionality would be frivolous. If the state supreme court had construed the requirement of uniformity in the Tennessee Constitution so as to permit recognition of these diversities, no appeal could successfully be made to the Fourteenth Amendment.''

Reference should be made to State v. Alabama Power Co., 254 Ala. 327, 48 So.2d 445, cited by respondents. In that case a public utility, the Alabama Power Company, protested the assessment of its property at 60 percent of taxable value while other property was assessed at not over 40 percent. The very question of whether the state constitution allowed this separate classification was presented. In holding that the Alabama Constitution did not allow classification, the Alabama court expressly recognized that in some states the constitutions authorize such classification and that no violation of the Fourteenth Amendment results. Hilger v. Moore, 56 Mont. 146, 182 P. 477, supra, has settled this question in Montana contrary to the position in Alabama, hence, this case is no authority here. It is helpful, however, in disposing of respondents' argument with respect to the Fourteenth Amendment.

Sections 1 and 11, of Article XII were a part of the Constitution of Montana as ratified by the people on October 1, 1889. Sections 1 and 11 must be construed together with section 15, which refers specifically to the state board of equalization. *Section 15* of Article XII, was first amended by Chapter 47, Laws of 1915, as later approved by the People in November 1916, effective on the governor's proclamation of December 4, 1916. Pursuant to that Constitutional amendment, the state board of equalization was, for the first time, specifically given the power to *"adjust and equalize the valuation of taxable property among the several Counties and the different classes of taxable property* in the same and in the several

counties and between individual taxpayers; supervise and review the acts of County Assessors and County Boards of Equalization; change, increase or decrease valuations made by County Assessors or equalized by County Boards of Equalization and has such authority and *may do all things necessary to secure a fair, just and equitable valuation of taxable property among the Counties and between the different classes of property and individuals.*" (Emphasis supplied.)

It was not until 1919 that the classification statute was enacted in section 1, Chapter 51, Laws of 1919. Consequently, before any legislative classification existed, the state board had the power to adjust and equalize valuations among the different classes of property and to do all things necessary to secure a fair, just and equitable valuation between the different classes of property. This necessarily included the power to determine, in the first instance, just what property *belongs* in the same *class.*

Section 15 of Article XII was later amended by Chapter 11, Extra. Session Laws of 1921, as adopted by the people in 1922 and effective under the governor's proclamation of December 14, 1922. By virtue of this amendment, the board's power was transformed to a duty. The amendment provides in part: "The state board of equalization *shall* adjust and equalize the valuation of taxable property among the several counties, and the different classes of taxable property in any county and in the several counties and between individual taxpayers; supervise and review the acts of the county assessors and county boards of equalization; change, increase or decrease valuations made by county assessors or equalized by county boards of equalization; and exercise such authority and do all things necessary to secure a fair, just and equitable valuation of all taxable property among counties, between the different classes of property, and between individual taxpayers.''

Once it is seen that the Board had the constitutional power to classify property itself, even before the enactment

of the classification statute, can it be said that the classification statute *limited* that constitutional power to classify property as the needs of a dynamic and progressive economy multiplied so as to promulgate the constitutional intent to spread the burdens of taxation among those who best can bear it according to the productivity of their property? As long as the Board treats property of similar nature and productivity the same, can it be said that the constitutional mandate of uniformity is not subserved? We do not think so.

█ The power granted the Board by the constitutional amendment to Sec. 15, Article XII, to "adjust and equalize the valuation of taxable property *among the several Counties and the different classes of taxable property*" and to "do all things necessary to secure a fair, just and equitable valuation of all taxable property among counties, *between the different classes of property*" necessarily included the power to determine what a particular class should include. The legislative enactment of 1919, of what is now section 84-301, did not and could not limit that power. Section 84-301 is patently broad in its terms. Class 4 includes "All land, town and city lots, with improvements, manufacturing and mining machinery, fixtures and supplies, except as otherwise provided by the constitution of Montana, and except as such property may be included in Class Five."

█ Under the Constitution, the Board has the power, in adjusting and equalizing taxation between oil pipe lines and other properties, i. e., town and city lots, to recognize pipe lines as a *class* in itself, and still not violate the requirement of uniformity.

The issues to be decided here, therefore, can be resolved to these:

(1) Is there any substantial evidence to support a finding that the Board utilized a fundamentally wrong principle of *assessment* or made an error so gross as to be inconsistent with any exercise of honest judgment?

628

(2) Is respondents' property properly classified as Class 7 property under section 84-301, R.C.M. 1947?

We shall consider this second issue first. As noted earlier, the district court held that respondents' properties were correctly classified in Class 7 which includes "All property not included in the six preceding classes." As Class 7 property, 40 percent of its value was computed as the basis for the imposition of taxes, pursuant to section 84-302, R.C.M. 1947. Respondents claim it is properly Class 4 property and subject to taxation to the extent of only 30 percent of its value, pursuant to section 84-302. Class 4 property includes "All land, town and city lots, with improvements, manufacturing and mining machinery, fixtures and supplies, except as otherwise provided by the constitution of Montana, and except as such property may be included in Class Five."

It was stipulated at the trial that respondents' pipe lines are imbedded in real estate rights-of-way, obtained from the record owners of the fee by written conveyances.

The Board argues that the pipe lines do not improve the real estate, serve no purpose on the land, do not enhance the value of the real estate and may be removed at the pleasure of the respondents.

The respondents argue that their rights-of-way, as easements, are interests in land and that the pipe lines, since they are affixed thereto, are properly termed fixtures or improvements.

Section 67-207, R.C.M. 1947, defines real property as:

"1.   Land;

"2.   That which is affixed to land;

"3.   That which is incidental or appurtenant to land;

"4.   That which is immovable by law."

Section 67-209, R.C.M. 1947, provides:

"A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or per-

manently attached to what is thus permanent as by means of cement, plaster, nails, bolts, or screws.''

In construing these two statutes, this court said in Montana Electric Co. v. Northern Valley Mining Co., 51 Mont. 266, 271, 153 P. 1017, 1018: ''These provisions are identical with like provisions found in the Civil Code of California since 1872, and, with the exception of section 4428 [now R.C.M. 1947, § 67-210], were copied from the proposed draft of a Civil Code prepared for the state of New York by David Dudley Field and his collaborators. The purpose of the Code was not to introduce new rules or definitions into the law, but rather to reduce to concise form the rules of law as they were then recognized and applied by the courts. Reference to New York and California decisions aids in determining the scope which the provisions of our Code above, were intended to have, and from those decisions we deduce the following: (1) Whether what would otherwise be personal property has become a fixture by reason of its attachment to the soil is primarily a question of intention on the part of the person attaching it; (2) the attachment in the manner indicated in our Code sections above raises a presumption that the one who made the attachment intended the thing affixed to become a part of the realty; this presumption, however, is a disputable one; (3) as a general rule, the manner in which the attachment is made, the adaptability of the thing attached to the use to which the realty is applied, and the intention of the one making the attachment, determine whether the thing attached is realty or personalty. [Citing cases.]''

In considering whether poles of an electric railway line were improvements this court has stated:

''That the poles are not improvements upon the street surely is patent, unless it may be said that they are fixtures. While a thing imbedded in the soil, a pole, ordinarily is a fixture (section 6669, R.C.1921 [now R.C.M. 1947, § 67-209]), certain tests are employed to ascertain whether

as a fact, an article attached to the realty is a fixture. Two of the tests are: The use or purpose of the annexation, which is entitled to much weight, and the intention of the party making the annexation, which is generally held to be the chief test. It is said that, if property is placed on land to improve it and make it more valuable, it is generally deemed a fixture, but, if attached for a use which does not enhance the value of the land it remains a chattel. The intention to make an article a permanent accession to the realty must affirmatively and plainly appear; if the matter is left in doubt and uncertainty, the legal qualities of the article are not changed, and it must be deemed a chattel. 11 R.C.L. 1061, 1062. By placing the poles in the streets and roads, the plaintiff did so for the purpose of transmitting power to its cars. The poles are accessory to its business not to the soil in which they stand.'' Butte Electric Ry. Co. v. Brett, 80 Mont. 12, 17, 257 P. 478, 480.

Considering then the rules as established by the foregoing authorities, can it be said that the intention of the respondents in placing the pipe in the ground was to make the pipe a permanent part of the realty? They have the right to remove their pipe, and common sense tells us that if the operation were unprofitable they would certainly salvage their pipe. What adaptability of the pipe lines imbedded in the ground exists to the use to which the realty is applied? In our view, the ground is only a foundation upon which the pipes can rest. The line could as easily lie on top of the ground were it not for the maintenance problem brought on by its exposed position and the difficulty of crossing natural and man-made obstructions. Does the pipe line improve the land and make it more valuable? To the contrary the land makes the pipe line more valuable since it removes it from danger of damage were it exposed. To what purpose is the pipe line put? It is used for the transportation of petroleum products and, in our opinion, such use bears no relationship whatever to the use of

the realty. There can exist here no presumption that respondents intended the pipe to become a part of the realty bcause the evidence is conclusive that they had no such intention.

While respondents rely upon State ex rel. Northern Pacific Ry. Co. v. Duncan, 68 Mont. 420, 219 P. 638, as supporting their position, that case is clearly distinguishable because it involved improvements located upon the railway right-of-way.

From what has been heretofore said, in our opinion, a pipe line is not a fixture and thus cannot be considered an improvement.

The State Board correctly classified the pipe line in Class 7 of section 84-301.

Turning then to the first issue as heretofore set forth, there exist well-defined principles which serve to guide the review of a decision of the Board of Equalization. It must be borne in mind, that in this discussion we are speaking of the propriety of the method of *assessment* by the Board, as that term has been heretofore defined.

In the recent case of Treasure State Pipe Line Co. v. County of Toole, 136 Mont. 108, 345 P.2d 162, 164, we said:

"In dealing with plaintiff's contention it may be well to preface our discussion with certain rules and principles with respect to assessment valuations which are well-established in this state. In the early case of Danforth v. Livingston, 23 Mont. 558, 562, 59 P. 916, 917, this court said: '* * * under the great weight of authority, courts will ordinarily not interfere with the action of these officers [assessing officers] to correct mere errors of judgment. It is only where they act fraudulently or maliciously, or the error or mistake is so gross as to be inconsistent with any exercise of honest judgment, that courts will grant relief. * * * Under the authorities cited, this fact [overvaluation], standing alone, is not sufficient to warrant the relief sought. There is not such an excess in the valuation as to justify a conclusive presumption of fraud or malice on

632

the part of the assessing officer. The value of property is a matter of opinion, and there must necessarily be left a wide room for the exercise of this opinion. Absolute accuracy cannot always be attained. Courts cannot be called upon, in every instance, to settle differences of opinion in this regard between the assessing officer and the property owner. Otherwise, courts would be converted into assessing boards, and, in assuming to act as such, would usurp the powers lodged elsewhere by the law-making branch of the government.' * * *

"In State v. State Board of Equalization, 56 Mont. 413, 448, 185 P. 708, 713, 186 P. 697, this court said further: '* * * in so far as the means to be adopted by them [State Board of Equalization] in arriving at values are concerned, we may not interfere. Those matters are within the discretion of the board, and so long as they are not guilty of fraud, and do not adopt a fundamentally wrong principle of assessment, we cannot interpose, or substitute our judgment for theirs.' "

Is there any substantial evidence here to sustain a finding that the Board acted fraudulently or maliciously, pursued a fundamentally wrong principle of assessment, or committed an error so gross as to be inconsistent with any honest judgment? The evidence relied upon most strongly by respondents is that the per-mile rate placed on the pipe lines of respondents exceeds the rates placed on similar properties, and that no inflexible formula was used in arriving at the unit value of each of their properties.

But the fixing of per-mile rates by the Board is only an artificial method of *apportionment,* as hereinbefore described. Divergence in these figures proves only that the unit values of the compared Companies are different or that the mileage of their pipe lines is different. It does *not* prove that the method of *assessment* employed in determining the unit values of respondents' property is fundamentally wrong or excessive.

The evidence presented below was voluminous concerning the exact method the Board used in finding the unit value of not only respondents' properties, but with respect to the assessment of similar property. There is not any substantial evidence to support a finding that either the use of the unit rule of valuation, or the use of the stock and bond-income-cost method of valuation resulted in an excessive assessment or is *fundamentally wrong*. It must be remembered that the Yellowstone Pipe Line Company contended here that the full value of all its pipe line property in 1955 did not exceed the sum of $4,901,300. Their annual report disclosed that this company had invested $17,158,023.42 in its Montana pipe line system. For rate-making purposes the Interstate Commerce Commission had placed a value of $15,683,844.79 upon the Montana portion of its system. The state board arrived at an assessed value upon its Montana system of $8,468,250. In view of these comparisons it must be conceded that the final valuation figure, rather than the individual factors used to arrive at it, do not reflect an excessive assessment as contended. The fact that no inflexible formula was used in assessing all systems in exactly the same manner does not prove that the Board was wrong. Flexibility should be a virtue, with respect to taxation, not a vice.

There is evidence herein which indicates that a different percentage "equalization factor" was applied to the properties of other utilities in 1955, and the court so found. In view of the general assessment situation existing today in Montana, and in view of the Board's policy of attempting to bring all assessments up to the statutory requirement of full cash value, and to equalize among the counties, we do not think that such divergencies in equalization show such discrimination as is forbidden by the Constitution. Perfect uniformity in taxation can never be achieved, and as long as substantially the same proportion of the same type of property is subjected to taxation, the courts will not interfere. Taxation is a complex

and difficult aspect of the law to administer, and as long. as those entrusted with this duty by the people are proceeding in good faith and in a reasonable and just manner, as the State Board has been shown to have acted here, and no substantial discrimination results, it would be an unwarranted interference with the executive branch of the government for the judiciary to substitute their judgment for that of the Board.

Except for that portion correctly holding that respondents' pipe lines should be classified in Class 7 of section 84-301, R.C.M. 1947, the judgments of the district court are reversed and set aside, and the cause remanded to the district court with instructions to make and enter judgments herein in favor of the appellant and against each respondent consistent with the views expressed in this opinion. Each party to bear their own costs on this appeal.

MR. JUSTICES ANGSTMAN, CASTLES and the HONOR-ABLE LESTER H. LOBLE, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, concur.

MR. JUSTICE ADAIR dissenting:

I dissent.

Two important questions are presented on this appeal. The first concerns the validity of the assessment of these particular Pipe Line Companies by the State Board of Equalization.

The second concerns the validity of the equalization process employed by the State Board of Equalization to arrive at the taxable value of such Pipe Line Companies before classification.

*The Assessment.* Assessment of inter-county pipe lines is a responsibility of the State Board of Equalization. The statute, R.C.M. 1947, § 84-905, provides that these pipe lines and other intercounty utilities are to be assessed by the State Board of Equalization and not by the county assessors.

The standard of value supplied in R.C.M. 1947, § 84-401, provides:

"All taxable property must be assessed at its full cash value. * * *"

This statutory standard controls all assessments regardless of who makes the assessment. In assuming to perform its statutory duties of assessing these intercounty Pipe Line Companies the State Board of Equalization adopted what it terms a *unit method* of assessment. In following this method and in assessing, pursuant to such unit method, the Board should have determined a value according to three following factors, viz.:

(1) Stock and debt value, (2) plant and equipment value, and (3) capitalized earnings value.

The application of this *unit method* of assessment may be demonstrated by setting out the actual assessment procedure employed by the Board.

*Yellowstone Pipe Line.* The Board's procedure in assessing the Yellowstone Pipe Line was as follows:

Stock and Bond Value

| | |
|---|---:|
| Common Stock .. | 4,100,000.00 |
| Notes | 16,400,000.00 |
| | 20,500,000.00 |
| Adjustment | 6,813,950.00 |
| | 13,686,150.00 |
| Capitalization Value | |
| Income for 4 months | 137,446.00 |
| Projected for 12 months | 412,338.00 |
| Capitalized at 6% | 6,872,300.00 |
| Cost of Plant and Equipment | 19,607,792.00 |

These factors were then totaled as follows:

| | |
|---|---:|
| | 13,686,150.00 |
| | 6,872,300.00 |
| | 19,607,792.00 |
| And divided by 3 ........................................../ | 40,166,242.00 |
| equalling | 13,388,747.00 |

An allocation factor for Montana operations of 85 percent was then applied and the assessed value of the Yellowstone Pipe Line in Montana was arrived at being, $11,440,684.

*Oil Basin Pipe Line.* In assessing the Oil Basin Pipe Line, the Board's procedure was as follows:

Stock and Bond Value

| | |
|---|---:|
| First Mortgage Bonds | 3,600,000.00 |

First Mortgage Bonds due in one year $300,000.00.
These not considered since due in one year.

| | |
|---|---:|
| Sinking fund debentures | 1,360,000.00 |

Common Stock 350,000 shares at 1 cent par. Taken at actual value as distinguished from market value

| | |
|---|---:|
| given in evidence as 1,750,000.00 | 70,400.00 |
| | 5,030,400.00 |
| Value of Plant & Equipment | 5,115,416.00 |

No capitalized value for the reason that company had only been operating 6 weeks.

These figures were then totaled with this result:

| | |
|---|---:|
| | 5,030,400.00 |
| | 5,115,416.00 |
| and divided by 2 | /10,145,816.00 |
| equalling | 5,072,908.00 |

From the above, the Board determined the assessed value of the Oil Basin Pipe Line to be $5,072,908.

The right to use the *unit method* is not here questioned. The *unit method,* combining as it does the three factors above enumerated when *properly used,* constitutes an honest method of valuing property for tax assessment purposes and I find no evidence in this case tending to show the method here used by the Board, overvalued any of the properties here involved. However, attention must be directed to the fact the Board did not make *proper* use of the *unit method* with the attendant

result that these pipe line properties were grossly *under assessed.* This, for the reason that the so-called *unit method* of assessment attempts to combine and reach an average value by employment of three distinct valuation procedures. The averaging of these values so obtained by three separate methods is for the purpose of putting within a proper prospective the respective valuations. However, the valuations to be averaged must, of necessity, be the fair and correct valuation obtained under the proper valuation procedure. It is improper to tamper with any of the valuation procedures.

If values are determined separately under all three methods, and then an average obtained, a value will be arrived at which most closely reflects the fairest assessed value sought to be determined under the applicable tax statute. With this in mind, it is obvious that the use of the *unit method* forecloses the assessing body form *juggling* the values which are to be averaged. The *unit method* as such is designed to level out the disproportionate valuations if any exist, yet what the Board did here was to render ineffective the procedure adopted.

The assessment by the Board, as set out here, is not a *unit value* assessment at all because the Board deliberately misstated the values of the factors to be *averaged.* The Board discriminated *in favor of the taxpayer,* and did not make a valid and honest assessment. An examination of the Board's assessment clearly demonstrates this.

Yellowstone Pipe Line's stock and debt value was $20,500,-000. *It was not anything less than that figure.* Yet the Board subtracted $6,813,850 in value from actual stock and bond valuation. The adjustment of over 6.8 million dollars is improper and illegal under the *unit method* and amounts to an abandonment by the Board of the *unit method* as a means of assessing the property. While the Board attempts to excuse this illegal adjustment by urging the line had been built over difficult terrain, yet the Board ignores the fact that actually the line being built over and through such difficult terrain gave and

gives the Pipe Line Company a competitive advantage worth far more in *actual value* than the additional cost of construction which the difficult terrain entailed. If this additional cost were disproportionate, the averaging of all the factors was designed to put it in its proper perspective. The action of the Board in distorting the factor of the stock and bond value of the Yellowstone Pipe Line Company destroys the validity of the Board's assessment. When the Board thus *edits* the factors to be used in the assessing formula then the assessment thereafter found is not an honest and legal assessment.

The Board, in assessing this property, was not merely trying to arrive at a correct assessment, but it sought and made an under assessment. While the Board asserts it was using a *unit method* of valuation, in truth and in fact, it was so juggling the essential factors of the method as to forsake and abandon the method itself. Such juggling is further apparent in the Yellowstone Pipe Line assessment when the capitalized valuation which the Board used as a factor is examined. The Board took the earnings of the Company for its initial 90-day period, but it never examined such earnings to ascertain whether they represented maximum possible earnings or partial use earnings. Next, the Board projected these 90-day earnings to represent a year's earnings at the same rate. In so doing, the Board was *not assessing but merely guessing*. The Board then capitalized these earnings at a 6 percent figure without a scintilla of evidence that such percentage is or ever would be the rate of return to the Company. Again, this is but a mere guess, not an assessment. The assessment of Yellowstone Pipe Line was not either an honest or legal assessment.

What then did the Board do in assessing the Oil Basin Pipe Line? In this particular assessment, the Board considered *only two factors.*

No capitalized value was set out for Oil Basin Pipe Line for the reason that such Company had been operating but six weeks prior to the time of the assessment. Accordingly, the

capitalization value factor was considered too uncertain to be a valid criteria of value. Here again, however, the Board was not content to let its adopted valuation procedures alone determine the level of assessment, but felt it had to help such figures along. To accomplish this the Board first understated the stock and bond values in the amount of $300,000. It asserts that this was done because the bonds in that amount would soon be due and payable. This procedure is similar to deducting a short term mortgage from the value of property which of course is highly improper. For example, if a person were to buy a house for $11,000, paying $1,000 in cash and giving a $10,000 mortgage for one year, the value of the house would nevertheless be and remain at $11,000.

Under the Board's procedure, however, the assessed value would be only $1,000, as the Board would subtract from the actual price paid the amount of the short term mortgage of $10,000. Next the Board juggled the value of the common stock of the Oil Basin Pipe Line Company. In its report to the State Board of Equalization the Oil Basin Pipe Line Company submitted three separate values which it had placed on its common stock. Par value, the Company stated to be one cent a share. Actual value the Company stated to be $70,400. Market value the Company stated to be $1,750,000.

The evidence given by a witness for the Board explaining how the stock value to be used by the Board was selected is most enlightening. When questioned about values selected by the Board, the witness testified:

"Q. And in the case of Plaintiff's Exhibit 7, which is the Oil Basin, you used *actual* value? A. In that year they did, and I can't tell you why because apparently if they used market value it would have given a terrific value $1,750,000 and it would be my opinion, and I think it was the Board's opinion that that was a little bit out of line."

In setting out the patent flaws in the Board's assessment of these properties it is not my purpose to usurp the function of

the Board or to assess the property. We fully appreciate that decisions of this court hold it is not within this court's power to perform the assessing functions given to the Board. Nevertheless, the question is presented here as to whether the method of assessment adopted and employed by the Board constituted an "honest and lawful" assessment and, on this appeal, it becomes this court's duty to examine the assessment procedure used by the Board and to answer the question so posed by the appeal. While this court will not assess we must determine whether the assessment was honestly and lawfully made. If found not to be an honest and lawful assessment then it becomes this court's duty to point out the defects in the assessing procedure employed, and return the cause to the trial court for further proceedings that shall conform to the law.

The assessments of these properties by the Board was improper, illegal and designed to fix a fictitious value and to understate the value of these pipe line properties, rather than to ascertain, set out and determine the full cash value as provided by law. Clearly the Board's assessment does not constitute an honest assessment.

*Inter-county Assessment.* In assessing inter-county properties of the two Pipe Line Companies, the Board seeks to assess the value of the properties as going businesses. The value of the business as a whole, as distinguished from the value of the component parts is what is sought to be assessed. The *unit method of* assessment seeks to find that business value. As heretofore set forth, the *unit method* combines various factors which in themselves are combinations of various types of property such as real property, personal property, cash, credits, etc., and the final average value determined by the Board becomes a combination of all such factors, hence, the average value determined can only be classified as Class Seven or "All property not included in the six preceding classes" of R.C.M.1947, § 84-301.

The second question presented concerns what the State

Board terms its "equalization process". What this involves is best illustrated by reviewing the procedure adopted following the ascertaining of the value of these properties.

Having determined, in the case of Yellowstone Pipe Line, that the property had the value of $11,440,684, the Board then applied what it termed "an equalization factor" of *74.02 percent* of the $11,440,684 value and by this method arrived at another value of but $8,468,250, which latter sum then constitutes the value before classification against which such taxes were to be levied.

In the case of Oil Basin Pipe Line, however, after the Board had determined a property value of $5,072,908, the Board then applied a different "equalization factor" amounting to over 76 percent of the $5,072,908, and by this different method arrived at another value of but $3,856,166 which latter sum then constitutes the value before classification against which taxes were to be levied.

In addition to the above-outlined procedure employed by the Board, evidence was presented at the trial which showed that certain other similarly classified property had been given an "equalization factor" by the Board of 62 percent of its property value as fixed by the Board. These arbitrary percentage figures represent the proportion of the value found and determined by the Board, and which the Board considers it must take into account for tax purposes in order to provide uniformity between the classes of the various kinds of property in the state.

The question of whether or not the equalized value as between properties of different classes must be uniform to comply with Article XII, §§ 1 and 11, of the Montana Constitution, is not presented on this appeal. However, it is quite apparent that Montana's Constitution requires that property of the *same class* be taxed uniformly. While a difference of but 3.8 percent may not appear significant to some yet this shows discrimination and inequality and is therefore violative

of the mandates of the Montana Constitution which require uniformity.

While assessors and assessing bodies are accorded a great deal of latitude in arriving at *assessed* values, and while such assessed values ordinarily will not be disturbed by this court on appeal where it appears the assessment is honestly made, yet where it appears the assessed value has been determined and thereafter only an arbitrary percentage of such assessed value is to be subject to tax, then and in such event the arbitrarily selected percentage must be identical for all taxpayers of the same class.

In view of this court's recent decision in Yellowstone Bank v. State Board of Equalization, 137 Mont. 198, 351 P.2d 904, upholding as valid, discriminations made as to taxpayers of the same class, we shall here consider only whether or not the type of discrimination here shown is violative of the Fourteenth Amendment to the Constitution of the United States. At the outset the remedy available to these taxpayers because of the patent discrimination here disclosed is not affected by the fact that this property is not taxed at 100 percent of its assessed value.

In Sioux City Bridge Co. v. Dakota County, 1923, 260 U.S. 441, 43 S.Ct. 190, 191, 67 L.Ed. 340, there was a discriminatory assessment which exceeded the assessed value of other properties. As a justification for such unequal assessment, it was contended that the complaining taxpayer's only remedy was petition to have the lower assessments brought up to his own level. As to such contention, the Supreme Court of the United States said: ''The dilemma presented by a case where one or a few of a class of taxpayers are assessed at 100 per cent. of the value of their property in accord with a constitutional or statutory requirement, and the rest of the class are intentionally assessed at a much lower percentage in violation of the law, has been often dealt with by courts and there has been a conflict of view as to what should be done. There is no doubt, however, of the view taken of such cases by the

federal courts in the enforcement of the uniformity clauses of state statutes and constitutions and of the equal protection clause of the Fourteenth Amendment. The exact question was considered at length by the Circuit Court of Appeals of the Sixth Circuit in the case of Taylor v. Louisville & N. R. Co., 88 Fed. 350, 364, 365, 31 C.C.A. 537, and the language of that court was approved and incorporated in the decision of this court in Greene v. Louisville & Interurban R. Co., 244 U.S. 499, 516, 517, 518, 37 S.Ct. 673, 61 L.Ed. 1280. The conclusion in these and other federal authorities is that such a result as that reached by the Supreme Court of Nebraska is to deny the injured taxpayer any remedy at all because it is utterly impossible for him by any judicial proceeding to secure an increase in the assessment of the great mass of under-assessed property in the taxing district. This court holds that the right of the taxpayer whose property alone is taxed at 100 per cent. of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law.''

It is obvious then that these taxpayers, who have shown that discrimination and inequality exist, as between themselves, and as between themselves and other members of the same class, have the right to have their assessment reduced to the percentage corresponding to the lowest percentage of assessment value assigned to any other member of the same class to the end that the just and ultimate purpose of the uniformity law shall be accomplished and maintained.

The question remaining is this: Does the record herein disclose a discrimination that is prohibited by law?

As heretofore shown, the employment of an arbitrary equal-

izing percentage is not an assessing procedure, hence, the assessing body when equalizing does not enjoy the same latitude as when assessing property.

In the instant case, after the assessed value had been determined all that was then required to equalize was to employ the same percentage factor against such assessed value found as had been applied to the other taxpayers of the same class. However this was not done. Here the equalizing percentages employed were different for practically every taxpayer within the class. It is obvious that such discrimination was intentional and systematic and that the employment of these equalizing factors by no stretch of the imagination may be said to have been errors in judgment made while using a valid and uniform method.

The situation, here presented, is controlled by Cumberland Coal Co. v. Board, 284 U.S. 23,, 52 S.Ct. 48, 50, 76 L.Ed. 146, wherein uniform coal bodies were assessed at uniform values notwithstanding the fact that certain of the coal bodies, because of location near a river were more accessible to transportation, and thus more valuable than those at more remote distances from the river and wherein the court said:

"It is established that the intentional, systematic undervaluation by state officials of taxable property of the same class belonging to other owners contravenes the constitutional right of one taxed upon the full value of his property. Sunday Lake Iron Co. v. Wakefield, supra; Sioux City Bridge Co. v. Dakota County, supra; Raymond v. Chicago Union Traction Co., supra; Chicago Great Western Ry. Co. v. Kendall, supra. In Sioux City Bridge Co. v. Dakota County, supra; (at page 446 of 260 U.S., 43 S.Ct. 190, 192), this Court, referring to the dilemma presented by a case where one or a few of a class of taxpayers are assessed at 100 per cent of the value of their property pursuant to statutory requirement and the rest of the class are intentionally assessed at a lower percentage,

stated the rule to be as follows: 'This court holds that the right of the taxpayer whose property alone is taxed at 100 per cent. of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law.'

"In applying this principle, the fact that a uniform percentage of assigned values is used, cannot be regarded as important, if, in assigning the values to which the percentage is applied, a system is deliberately adopted which ignores differences in actual values so that property in the same class as that of the complaining taxpayer is valued at the same figure (according to the unit of valuation, as, for example, an acre) as the property of other owners which has an actual value admittedly higher. Applying the same ratio to the same assigned values, when the actual values differ, creates the same disparity in effect as applying a different ratio to actual values when the latter are the same. If the commissioners, in the instant case, had taken the basis of 100 per cent, instead of 50 per cent. of the assigned values, but had adopted the same method of assessment by which all the coal in a township (aside from active coal) was assessed at the same value an acre, despite well-known and important differences in value, the result would have been an undervaluation of similar coal belonging to other owners, which would have brought the case of the petitioners within the principle of the decisions cited. In such case, if the petitioners' property had been valued at 100 per cent. of its actual value, the like property of the other owners, having a higher actual value, would in effect have been valued at

less than 100 per cent. The discrimination is essentially the same, and is equally repugnant to constitutional right, when both assessments are made on the basis of 50 per cent. of assigned values and differences in actual values are deliberately and systematically disregarded. The undervalued property is in effect valued at less than 50 per cent. of its actual value; for example, coal of the same description worth twice as much as that of the Cumberland Coal Company was really valued at 25 per cent. of its actual value.

"The petitioners are entitled to a readjustment of the assessments of their coal so as to put these assessments upon a basis of equality, with due regard to differences in actual value, with other assessments of the coal of the same class within the tax district."

In the instant appeal, this court has before it the same type of systematic, intentional discrimination by the employment of different so-called equalizing percentages of the assessed values to like properties of the same class, for the purpose of levying the tax. Such obvious discrimination and inequality clearly violates the Fourteenth Amendment of the Constitution of the United States.

In disposing of this appeal, I would enter an order directing the State Board of Equalization to reassess these properties in conformity with the law as above-stated to the end that uniformity and equality be achieved and maintained as is required by our Constitution, both State and Federal.