SHEPPARD et al. v. ATLANTIC PIPE LINE CO.

No. 9351.

Court of Civil Appeals of Texas. Austin.

Oct. 7, 1942.

Rehearing Denied Oct. 21, 1942.

Gerald C. Mann, Atty. Gen., and Harold McCracken, Ardell Williams, and Geo. W. Barcus, Asst. Attys. Gen., for appellants.

Charles B. Ellard, of Dallas, and John W. Stayton and Black, Graves & Stayton, all of Austin, for appellee.

BLAIR, Justice.

This appeal is by the members of the State Tax Board, herein called Board, from a temporary injunction restraining them from certifying for taxation purposes the value of the intangible assets of appellee, Atlantic Pipe Line Company, to the tax assessors of the various counties through which the company's pipe lines run. See Arts. 7105–7113, R.S. 1925, as amended, Vernon's Ann.Civ.St. arts. 7105–7113. The injunction was sought upon the ground that the formula used by the Board in arriving at the value of appellee's intangible property is fundamentally wrong: (1) because the formula primarily considered past earnings, whereas there is no connection between appellee's past earnings and what it will earn in the future; and (2) because it inevitably discriminated against appellee and in favor of other pipe line companies which had not theretofore made as much net earnings as had appellee. The trial court granted the injunction upon the ground that the "case presents substantial questions as to the validity and legality of the method used by defendants in fixing the value of plaintiff's intangible property 1or intangible tax purposes, and justice requires that these substantial questions be fully developed through evidence and argument, which can only be done in a trial on the merits."

The evidence adduced on the extensive hearing of the temporary injunction application does not authorize it under the law applicable. The preliminary value fixed was $4,243,300, of which preliminary valuation appellee was given notice, and after a full hearing the Board reduced the value of $3,606,800. Each member testified that he exercised his best judgment in arriving at this value, taking into consideration the reports required to be filed by appellee under Art. 7106, all data which could be secured, and the value ascertained by the Board's expert valuation employe, who submitted the formula complained of and two other formulas to check the fairness and reasonableness of the said formula; all of which formulas are agreed to be those used and approved in the valuation of intangible property or going concern value of business enterprises. The three formulas showed the value of 40% of appellee's intangible assets to be from $3,764,352 to $5,371,777, each of which was higher than the reduced and final value of $3,606,800, as fixed by the Board. In reducing the preliminary valuation the Board took into consideration the reduced income of appellee due to a decision of a federal court prohibiting appellee from paying to the holding corporation, which owned practically all its stock and was practically its only customer, more than 7% on the valuation of its property as fixed by the Interstate Commerce Commission, and due to war conditions. The experts agreed that the formula complained of was an approved method for valuation of intangible properties, their difference of opinion arising only as to whether it had been properly applied to the facts of the instant case. All experts agreed that the matter of value of intangible property was largely one of opinion, and differed materially as to different business enterprises.

The formula attacked as being wrongful was known as the capitalization-of-net-income method. Under the Elkins Act, as amended, 34 Stat. 587–589, 49 U.S.C.A. § 41, appellee was subject to the jurisdiction of the Interstate Commerce Commission, and a federal court consent decree prohibited appellee from paying after January 1, 1942, to the holding corporation, which owned 99.995% of appellee's stock and which was practically its only customer, more than 7% on the valuation of its property as fixed by the Interstate Commerce Commission. Prior to this decision appellee had for the years 1938, 1939, 1940 and 1941, paid the holding corporation from 19% to 23% as net earnings. The Board capitalized these four years' past earnings with its estimated net income under the reduced tariffs claimed to be required by the federal court decision for 1942, and these net annual incomes for the five-year period (1938–1942) were averaged to determine the amount of the net income to be capitalized, and as thus capitalized the preliminary value of 40% of appellee's

intangible property in Texas was fixed at $4,243,300, but which the Board reduced on final hearing to $3,606,800, and as to this value each member of the Board testified that he exercised his best judgment. That appellee does not attack the formula used but only its application to the facts above detailed is shown by the following summation of its contention:

"The Board used a formula involving capitalization of net earnings. Appellee finds no fault with that general method. The Board has capitalized on the theory that a very risky enterprise like a pipe line business should be permitted to earn 11% on its intangible property. Appellee finds no fault with that. Where appellee and the Board differ is over the earnings figure capitalized by the Board. It is more than twice the earnings that can be or will be realized in any future year by appellee. It is more than twice as much because the Board used a net earnings figure arrived at by averaging four years of past earnings with one year of future earnings, in spite of the fact that the past earnings furnish no basis whatsoever for forecasting future earnings. Under the circumstances, the method used by the Board was fundamentally wrong."

■ We regard the undisputed facts as bringing the instant case within the rule of Druesdow v. Baker, Tex.Com.App., 229 S.W. 493, 495, wherein the court held:

"The decisions of the Tax Board in the matter of valuations are quasi judicial in their nature. * * * No mere difference of opinion, as to the reasonableness of its valuation, when such valuations, though deemed erroneous, are the result of honest judgment, will warrant interference by the courts. [Cites authorities]

"The formulas, which the railway company attacked as fundamentally wrong, were used as the bases for the preliminary estimate or valuation. These formulas were exhibited to the representatives of the railway company prior to the hearing and were the subject of discussion at the hearing. The process used by the Board in reaching its preliminary valuation is wholly immaterial, the ultimate conclusions or final valuations being the matters under investigation; and unless it be shown that the method used brought about unjust and unlawful results, its judgment will not be disturbed.

"The evidence by the Tax Commissioner is to the effect that the Board, in assessing intangibles of all railroads, considered all the evidence and information, and that, disregarding the mathematical calculation, the valuation finally determined represented in each instance the best judgment of which the Board was capable under the circumstances; that the Board withheld its decision in each instance until the evidence was all in, and if the formula did not reflect what the Board considered a fair and just valuation, the Board changed it."

■ The substance of appellee's contention is that the formula used was fundamentally wrong because it took into consideration the four years' past earnings which amounted to from 19% to 23%; whereas, under the federal decision it would not thereafter be permitted to pay the holding company more than 7% based upon the I. C. C. valuation of its property; and in consequence its experts were of the opinion that appellee did not now have any intangible value or property. The Board's experts were of the opinion that since appellee's property had been paid for, and the pipe line served oil fields which oil authorities estimated would produce oil from 23 to 32 years, and since the federal decision did not limit the tariffs appellee could charge, but only the amount it could pay the holding company was limited, the position of the corporation itself was stabilized and its business under the formulas used had an intangible value of the several amounts arrived at by the use of the formulas. It was agreed that the formula used as well as those used to verify it were approved methods of determining the intangible or going concern value of various kinds of businesses, and as hereinabove stated the difference of opinion of the experts arose only as to whether the formula used had been properly applied to the facts, and perhaps as to whether the supporting formulas had been considered by the Board, or, if so, properly applied. It was also shown that appellee did not intend to go out of business, and intended to fix rates so as to enable it to pay the holding company 7% on the I. C. C. valuation. The rates fixed for 1942 would produce more than 10%.

On principle the decision of the Supreme Court of the United States in the Druesdow case, 263 U.S. 137, 44 S.Ct. 40, 41, 68 L.Ed. 212, answers this question of decline

in net income as affecting intangible value against appellee as follows:

"The net earnings of the company in 1911 to 1914 were so small that, if the property were capitalized on the basis of 7 per cent., it would appear to have been worth less than $30,000,000 in 1912, and in 1914 less than $1,000,000. In the latter year the company, unable to pay its fixed charges, again passed into receivers' hands. The state tax board fixed the value of the physical property in 1915 at $28,372,810, and of the intangibles at $10,743,233; making the value of the entire property $39,116,033.

"The receivers contend that, even if the value of the entire property was as found by the state board, the physical property was undervalued, resulting in an over-valuation of the intangibles so gross as to amount to a denial of due process of law. There was evidence, including statements made by the receivers, which supports the state board's valuation. The trial court, upholding this valuation, found that it represented the honest judgment of the state board; and that there was no evidence of arbitrary action or of improper motives on its part. This holding of the trial court was approved by the highest court of the state. There is no evidence of arbitrary action, of fraud, or of gross error in the system on which the valuation was made to justify the claim of denial of due process. [Citing authorities]. Mere errors of judgment are not subject to review in this proceeding." (Citing authorities.)

■ The same rule applies as to the claim of appellee that the use of the formula inevitably discriminated against it in favor of other similar pipe line companies, because for the four years prior to 1942 it had made net earnings of from 19% to 23%, whereas the other similar companies had made net earnings which averaged a little more than 15% for the same four-year period. Aside from the fact that a mere showing that prior to the application of the formula one corporation earned more net income than another would not show inevitable discrimination; but under the undisputed facts the formula was used only as an aid to the Board in arriving at 40% of the true value of the intangible as-

sets. The $4,243,300 preliminary value arrived at by the aid of the formula complained of and other formulas and data was on final hearing reduced to $3,606,800, which, according to the testimony of each member of the Board, was his best judgment as to 40% of the true value of the intangible assets of appellee for taxation purposes. These undisputed facts bring the instant case not only within the rule of the Druesdow case; but it is similar on principle and facts to the case of Illinois Central R. Co. v. Greene, 244 U.S. 555, 37 S.Ct. 697, 700, 61 L.Ed. 1309, 1316, wherein the court in construing a statute similar to ours held as regards the use of a fundamentally wrong principle or method of calculating value, that:

"The district court properly held that the action of the Board must be sustained unless it was made to appear that they had adopted a fundamentally wrong principle, or had been guilty of fraud. It held further, that no fundamentally wrong principle was involved in determining whether such a railroad system should be valued on the capitalization-of-income or on the stock-and-bond plan; or, if the former, what rate of interest should be used in capitalizing, or how many years' earnings should be considered, or what was in fact the amount of net income for a given year: or, if the stock-and-bond plan was adopted, what was the value of the stock and bonds; and that on these and similar matters the action of the Board, in the absence of fraud, was binding upon the court. In this we concur."

The order appealed from is reversed and the temporary injunction granted by the trial court is dissolved.

■ In order that the questions presented may not become moot pending application for writ of error to the Supreme Court, this order of dissolution is suspended pending such application; provided, however, that this suspension order shall cease to be effective on and after October 28, 1942, if at that time no application for writ of error has been filed. See Railroad Commission v. Primrose Petroleum Co., Tex.Civ.App., 80 S.W.2d 509.

Reversed and temporary injunction of trial court dissolved.