TREASURE STATE PIPE LINE COMPANY, a corporation, Plaintiff and Respondent, v. COUNTY OF TOOLE, a political Corporation of the State of Montana, and MALCOLM P. LYON, as County Treasurer of the County of Toole, State of Montana, Defendants, and THE STATE OF MONTANA and THE STATE BOARD OF EQUALIZATION of the State of Montana, Intervenors and Appellants.

No. 9825.
Submitted September 29, 1959. Decided October 21, 1959.
345 Pac. (2d) 162.

See **C. J. S.** Taxation, § 410.

Forrest H. Anderson, Atty. Gen., Edward C. Schroeter, Tax Counsel, State Bd. of Equalization, Helena, for appellants. Edward C. Schroeter argued orally.

LaRue Smith, Jr., Great Falls, for respondent. Mr. Smith argued orally.

MR. CHIEF JUSTICE HARRISON:

This is an appeal from a judgment of the district court of the ninth judicial district of the State of Montana, in and for the County of Toole, rendered on the 8th day of March 1957, adjudging that plaintiff corporation, engaged in the business of transporting natural gas in underground pipe lines in Toole County, was entitled to recover the sum of $1,842.20 from defendant Toole County, as excessive taxes paid under protest.

The district court found that the assessment of plaintiff's property was made in total disregard of the action of the County Board of Equalization of Toole County, Montana, and was made on a fundamentally wrong principle of assessment and constituted an error or mistake so gross as to be inconsistent with any exercise of honest judgment, and, therefore, totally unlawful; and that plaintiff was thereby compelled to pay the sum of $1,842.20 in excess of the amount which should have been levied, and that the same was paid within the time allowed by law under written protest.

The facts which gave rise to the litigation are these:

On the 1st Monday in March 1954, plaintiff was the owner and in possession, control and management of different types of

pipe lines which were used in its business in Toole County for transporting gas, as well as line pipe in storage for future use.

On the 15th day of May 1954, plaintiff delivered to the County Assessor of Toole County, Montana, statements wherein it set forth specifically its real and personal property on forms provided by the county assessor and alleged the full cash value of said pipe line was the amount of $91,831. On the 19th day of July the State Board of Equalization adopted a resolution wherein it was set forth that the plaintiff's estimated value of its pipe line was less than its full and true value and less than the schedule adopted by the Board for evaluating such property as of the first Monday in March 1954.

The State Board made an order directing the County Assessor of Toole County to assess plaintiff's property as of the 1st Monday of March 1954, in the aggregate amount of $192,915.

Plaintiff was notified of the resolution and order on the same date.

Thereafter, on or about the 30th day of July, plaintiff filed with the Board of County Commissioners of Toole County, sitting as the County Board of Equalization, a written application for a reduction in the assessed valuation of the said property setting forth the facts on which it was claimed such reduction should be made, pursuant to section 84-603, R.C.M. 1947.

On or about the 14th of August, the County Board of Commissioners, sitting as a County Board of Equalization, after examining the plaintiff's witnesses at a hearing concerning the valuation of said property, adopted a resolution whereby the valuation contended by plaintiff for its oil field equipment in Toole County was sustained and the "Supplemental Assessment proposed by the State Board of Equalization" was disallowed.

On August 16, the State Board of Equalization filed notice of appeal and served a copy thereof on plaintiff. On October 5, a hearing was held before the State Board of Equalization in Helena on said appeal at which time the plaintiff appeared with its witnesses and submitted evidence in support of its valuation

and of the action of the County Board of Equalization of Toole County.

On the 27th day of October, the State Board of Equalization entered an order that the aggregate assessed valuation of plaintiff's property in question remain at $192,915. Thereafter plaintiff paid the alleged excessive sum of $1,842.20 under protest and brought this action in the district court to recover that amount.

Plaintiff's principal contention, as alleged in its complaint and urged on this appeal, is that the assessments made of its property did not represent the full cash value of said property. It is alleged they were grossly excessive and were so arbitrary, discriminatory and unfair as to constitute error or mistake so gross as to be inconsistent with any exercise of honest judgment, and also represented the adoption of a fundamentally wrong principle of assessment in total disregard of the original cost of the pipe, the age of the pipe, the weight of the pipe, the condition of the pipe, the present sale value of the pipe, the replacement cost of new pipe, the return of valuation made by the plaintiff, the assessed valuation for 1952, and the style of the pipe. All of which factors it alleged had a bearing on the full cash value as defined by statute.

These allegations were denied by the defendants. After hearing evidence at the trial, the court, sitting without a jury, found for the plaintiff, and in its decree found that the assessments were not the full cash value of said property but were grossly in excess thereof and so arbitrary, discriminatory and unfair as to constitute error or mistake so gross as to be inconsistent with any exercise of honest judgment.

On appeal, the defendants specified this holding as error and as this appeal may be disposed of on this point alone, appellants' other specifications need not be considered.

The evidence showed that the assessments attacked by the plaintiff were based on a schedule of valuations drawn up in 1953 at a meeting held between a number of county assessors and a number of representatives of various oil companies and subse-

quently adopted by the State Board of Equalization. This schedule is known as the "1954 schedule."

The evidence showed further that the valuations set forth in the schedule represented fifty percent of the cost of replacing various types of property in the year the return is made. This method was used for valuating pipe line in the ground. Line pipe stored for future use was valued at the book value as shown in the taxpayer's books.

Testimony showed that the first schedule adopted on oil field equipment, including pipe lines, was in 1927. That schedule was revised in 1929, in 1939, in 1946, in 1953 and again in 1955. All of these schedules reflected valuation for assessment purposes as fifty percent of current replacement cost for pipe line in the ground.

Cross-examination of Mr. Del Lowry, the Secretary-Treasurer of plaintiff corporation, showed that the 1952 valuation submitted by plaintiff corporation to the county assessor was based on the 1946 schedule which was in effect at that time. No evidence was introduced by plaintiff to show that plaintiff felt that such method of valuation was arbitrary or unfair at that time.

On redirect examination of Mr. Lowry, in fact, he testified, in effect, that certain pipe line had increased in value and that the 1946 schedule represented an honest and fair valuation.

It is evident that this controversy arose for two reasons. The 1954 schedule, under which the assessments complained of were made, reflected a considerable increase in the valuation of certain property over the 1946 schedule. Also the 1955 schedule incorporated a new principle of valuation by, in effect, depreciating the value of pipe which had been laid prior to 1940. Depreciation had never been a factor in the earlier schedules and evidence showed that various representatives of different oil companies had not desired that depreciation be a factor but instead had promoted the "fifty percent of current replacement cost" as the basis for valuation.

The question to be resolved here is simply this, Did the lower

court err in holding that the assessment complained of was made on a fundamentally wrong principle and constituted an error or mistake so gross as to be inconsistent with any exercise of honest judgment because the schedule upon which it was based, that is, the 1954 schedule, represented substantially increased valuation over prior schedules, when such prior schedules had been based on the same principle of valuation, that is, "fifty percent of current replacement cost" and had been drawn up through the joint efforts of county assessors and representatives of the oil industry itself? We think so.

In dealing with plaintiff's contention it may be well to preface our discussion with certain rules and principles with respect to assessment valuations which are well-established in this state. In the early case of Danforth v. Livingston, 23 Mont. 558, 562, 59 Pac. 916, 917, this court said: "* * * under the great weight of authority, courts will ordinarily not interfere with the action of these officers [assessing officers] to correct mere errors of judgment. It is only where they act fraudulently or maliciously, or the error or mistake is so gross as to be inconsistent with any exercise of honest judgment, that courts will grant relief. * * * Under the authorities cited, this fact [overvaluation], standing alone, is not sufficient to warrant the relief sought. There is not such an excess in the valuation as to justify a conclusive presumption of fraud or malice on the part of the assessing officer. The value of property is a matter of opinion, and there must necessarily be left a wide room for the exercise of this opinion. Absolute accuracy cannot always be attained. Courts cannot be called upon, in every instance, to settle differences of opinion in this regard between the assessing officer and the property owner. Otherwise, courts would be converted into assessing boards, and, in assuming to act as such, would usurp the powers lodged elsewhere by the lawmaking branch of the government."

The principles set forth in the Danforth case were well summarized in Investors Security Co. v. Moore, 113 Mont. 400, 404, 127 Pac. (2d) 225, 227, along with the many Montana cases which have reiterated the same principle. In the Moore case this

court said: "It is well settled that the court will not substitute its judgment for that of the taxing officials and will not notice an overvaluation honestly made, but will grant relief on overvaluation only when it is so gross as to be inconsistent with the exercise of honest judgment. State v. State Board of Equalization, 56 Mont. 413, 185 Pac. 708, 186 Pac. 697; Danforth v. Livingston, 23 Mont. 558, 59 Pac. 916; State ex rel. Schoonover v. Stewart, 89 Mont. 257, 297 Pac. 476; Johnson v. Johnson, 92 Mont. 512, 15 Pac. (2d) 842; International Business Machine Corp. v. Lewis and Clark County, 111 Mont. 384, 112 Pac. (2d) 477."

In State v. State Board of Equalization, 56 Mont. 413, 448, 185 Pac. 708, 713, 186 Pac. 697, this court said further: "* * * in so far as the means to be adopted by them [State Board of Equalization] in arriving at values are concerned, we may not interfere. Those matters are within the discretion of the board, and so long as they are not guilty of fraud, and do not adopt a fundamentally wrong principle of assessment, we cannot interpose, or substitute our judgment for theirs."

Has the plaintiff here proven that the assessing officers acted fraudulently or maliciously or that they made an error or mistake so gross as to be inconsistent with any exercise of honest judgment or that a fundamentally wrong principle of assessment was used? There was no direct evidence shown in the record to indicate malice or fraud on the part of the assessing officer. Plaintiff attempted to support this contention by showing that the assessed value of its property had greatly increased over the preceding year. From this fact alone plaintiff asserts that the assessment was proven to be arbitrary and capricious and inconsistent with the exercise of reasonable judgment.

But the record also indicates that the assessment in the preceding year was based on a 1946 schedule. The assessment complained of here was based on the 1954 schedule. It is only reasonable to assume that the increased valuations in the 1954 schedule reflected the inflationary trend which occurred between 1946 and 1954 and is not proof that the assessing officials acted

arbitrarily or capriciously or in the exercise of other than honest judgment.

Plaintiff's assertion that the assessing officials pursued a wrong method of assessment is based on their contention that valuations as shown in the 1954 schedule bore no relation to the original cost of the pipe, the age of the pipe, the weight of the pipe, the condition of the pipe, the present sale value of the pipe, the replacement cost new of the pipe, return of valuation made by the plaintiff, the assessed valuation for the next preceding year, and the style of the pipe.

The evidence did show that the valuations in the 1954 schedule were not based on these factors but, like all the valuations that had preceded it, was based on fifty percent of current replacement cost in the year of return. This contended "fundamentally wrong principle of assessment" had been used since 1927, had been concurred in by a number of the representatives of the oil industry, and the same principle was utilized by the plaintiff itself in making its return for 1952. The correct method of valuating such property is a matter of widely divergent opinion between the State Board of Equalization and the plaintiff.

There may be numerous methods of valuating property other than that used here which are equally as reliable or even more so, but it cannot be disputed that the method of valuating property by establishing its cost of replacement and then deducting fifty percent in lieu of depreciation is a recognized method of valuating property. See 1 Bonbright, Valuation of Property 150 (1937). This method certainly cannot be classified as a fundamentally wrong principle.

It may very well be that the valuation schedule promulgated by the State Board of Equalization was revised in 1955 for the purpose of allowing adjustment of value on older pipe, but even though the adjustment was not allowed at the time plaintiff's property was assessed, which might have resulted in some overvaluation of its property, there was no proof that the assessing officials acted arbitrarily, capriciously, fraudulently or in the

exercise of other than honest judgment, or utilized a fundamentally wrong method of assessment. In such case, the lower court could not substitute its judgment for that of the assessing official, and erred in doing so.

We find no basis in the record for the lower court's action in interfering with the assessments of the State Board of Equalization. Its judgment is reversed and this cause is remanded to the district court with directions to enter appropriate judgment for defendants.

MR. JUSTICES ANGSTMAN and CASTLES concur.

MR. JUSTICES BOTTOMLY and ADAIR, specially concurring:

It appears to us from the briefs and arguments of counsel, in the instant case, that the procedure followed by the county assessor with regard to assessing the pipe lines involved and lying wholly within his county has adopted a very unique system of establishing the ''assessed value'' for ascertaining the ''taxable value'' of such pipe line properties.

It appears that, for many years past, the county assessors, having the oil and gas industry in their respective counties, met at various times, consulted with representatives of the industry and then reached an agreement or agreements with such representatives as to the particular method or formula to be adopted and employed in assessing the pipe line properties and in determining the value to be used for such tax assessment.

The line pipe agreement seems to have been as follows: The average cost of the pipe delivered in Montana was to be determined; the pipe was to be assessed at 50 percent of the average cost, new, each year; the pipe line taxpayer was to be allowed *no* depreciation from such cost; the state *was not* to *assess in excess of this 50 percent of cost new each year;* and neither the cost of the right of way or easement where the pipe line had been acquired from private sources, nor the value of the interest in real estate, nor the cost of installation, nor the profit from the

pipe line business were facts to be considered by the assessor in making his assessment. All such factors the assessor gave up or forgave in consideration for the taxpayer returning the pipe *at an assessed value of 50 percent of its market value without any depreciation,* instead of the full cash value as provided by law. R.C.M. 1947, sec. 84-401.

While possibly not all pipe line people were represented at these consultations and meetings where this unique method of assessment was set up, yet it appears that most, if not all, followed the schedules prepared according to the agreements so made and the Treasure State Pipe Line was one that followed these schedules and accepted the assessment so agreed upon.

Now it appears such assessment was to be changed each year to reflect 50 percent of the cost new of the pipe to be assessed. However, the taxpayers soon found that some of the assessors, instead of adjusting the pipe costs yearly would merely continue using the schedule first adopted as the formula or schedule for each succeeding year. Obviously, in times of rising cost prices for pipe, as was the case for many years, this method resulted in a *decided tax advantage for this class of taxpayer.*

Thus, in the instant case, the taxpayer contended by the proposed assessment list for 1954 which it submitted that it should be taxed only upon 50 percent of the cost of new pipe back in the year 1946.

In this, the taxpayer was not even following the assessment formula and agreement reached between the pipe line companies and the assessors. The reason of course for not following it was clear,—it resulted in a most substantial tax saving.

In 1953, the assessors determined that the taxpayers, subject to the agreement above-mentioned, were still using the 1946 schedules. Thereupon the assessors revised the schedules to bring them up to date. This is the schedule the State Board of Equalization proposed the taxpayer, in the instant case, should follow and pay tax upon.

The revised 1953 schedule resulted in an increase in the taxable assessment in this one year, whereupon the taxpayer im-

mediately contended such increase constituted an arbitrary assessment. However the taxpayer had agreed to yearly adjustments provided not more than 50 percent of the value was assessed but the assessor had failed to adjust yearly his assessment as heretofore agreed upon. When, at long last, the assessor adjusted the schedule to make it conform to the agreement, the taxpayer, in the instant case, asserted the assessment became, was, and is arbitrary.

While it would be arbitrary to increase the taxpayer's assessment from that of the previous year without the showing of an increase in value between the two years, yet if the assessment were to be made upon an agreed amount of the fair market value of specified property year by year, still the taxpayer would have no cause to complain if the assessment does not exceed the amount theretofore agreed upon.

Of course it would be arbitrary to increase assessments in one year to take into account appreciation of values which might have occurred over the last five, ten or fifteen years instead of basing the increased assessment upon the appreciation in value between the prior year and the taxable year in question, yet when the increase or decrease in value is to be determined by an agreed formula, as here, then the taxpayer cannot complain when the agreement is enforced, irrespective of whether or not it was followed before by the other party to the agreement. The pipe line company had bound itself to submit to the agreed method of taxation. It had obtained a decided tax advantage in the many years when the agreement was not strictly asserted against it.

It agreed *not to take depreciation in order to have only 50 percent of the market value of its property taxed.* Yet when the shoe began to pinch a bit because of the rising cost of pipe it then asserted the Board was arbitrary in trying to assess according to the so-called agreement. It appears, however, that the taxpayer was anxious to fix the formula in 1955. At that time a new agreement was made between the pipe line people and the assessors of the counties wherein the pipe line com-

panies had property. Now such pipe line companies are assessed on only 50 percent of the market value of pipe and such companies get what amounts to depreciation on all pipe acquired before the year 1940.

The pipe line companies gave up the depreciation to get assessment at *one-half value* and then *came back and in addition took depreciation.* It appears that these taxpayers have not proved a case that entitled them to any relief. For this reason we agree with the result reached in the majority opinion.

It is clear upon the record before us that neither the county assessors nor the State Board of Equalization followed the plain mandate of the statutes governing the determination of the "full cash value."

R.C.M. 1947, sec. 84-401, declares:

*"All taxable property must be assessed at its full cash value.* Land and the improvements thereon must be separately assessed." Emphasis supplied.

R.C.M. 1947, sec. 84-101, subd. 5, states:

"The terms 'value' and 'full cash value' mean the amount at which the property would be taken in payment of a just debt due from a solvent debtor."

Such unauthorized procedure as above set forth allows the pipe line companies to be the judge of the full cash value of their property instead of being bound, as all other taxpayers are bound, by the law as interpreted and applied by the proper public constitutional officers charged with the duty of making such determination.

Instead of adopting the formula so allegedly arrived at by the private negotiations of the parties, the plain mandate of the written law, enacted by the legislature, should be followed in order that all taxpayers shall be taxed as is provided by law and not by the private dickerings of the parties to the end that all of the people will retain their confidence and trust in their taxing officials and in their courts, and in the assurance that all shall observe, follow and abide by the law as written and enacted.