479 P.2d 174

NAVAJO COUNTY, Arizona, Mohave County, Arizona, Apache County, Arizona, Coconino County, Arizona, Yavapai County, Arizona, and State Department of Property Valuation, Appellants,

v.

FOUR CORNERS PIPE LINE COMPANY, Appellee.

No. 10139–PR.

Supreme Court of Arizona, In Banc.

Dec. 31, 1970.

**512**

Gary K. Nelson, Atty. Gen., by James D. Winter, Asst. Atty. Gen., Phoenix, for appellants.

Ryley, Carlock & Ralston by George Read Carlock, and William F. Wilder, Phoenix, for appellee.

McFARLAND, Justice.

This is a petition for review of a decision of the State Court of Appeals, 12 Ariz.App. 348, 470 P.2d 496 which affirmed the judgment of the Maricopa County Superior Court in favor of the Appellee, Four Corners Pipe Line Co., (hereinafter referred to as the Company) and adverse to the appellants and the defendants in the court below (Navajo County, Mohave County, Apache County, Coconino County and Yavapai County, hereinafter referred to as the State). The Company is the owner of certain property involved in this case which consists of a 16-inch diameter pipe-line originating in the Four Corners area of Arizona and thence crossing the counties involved into the Los Angeles area and which is used primarily for the gathering and transportation of crude oil. The pipe-line was constructed in 1958 at the approximate cost of $45,000,000.00. In 1967 it was valued by the Interstate Commerce Commission for rate making purposes at $35,000,000.00. It has been stipulated by the parties here that the portion of the pipe-line which is in Arizona represents 45.4% of the total system. The sole question involved in this matter is the valuation of the pipe-line by the State Department of Property Evaluation for the purposes of ad valorem taxes. It is contended by the Company that the proper valuation should be $8,141,128.00. On the other hand the State takes the position that the valuation made by the Department was properly assessed at $19,799,-985.00.

The Company, in accordance with the statutes paid the taxes that were levied against it by the State on behalf of the various counties and then appealed the taxation to the Superior Court. After a lengthy trial, having heard witnesses from both sides, it decided in favor of the Company that the proper assessed valuation was, as claimed by the Company, $8,141,-128.00. From this judgment the State appealed. The Court of Appeals sustained the lower court and it is now before this Court.

In the lower court the Company raised the question of the constitutionality of the taxing system, claiming that they were deprived of due process of law in that a valuation, or method of evaluation, was placed upon their property differing from that used for other similar businesses. This has not been an issue in the appellate courts and apparently has been abandoned by the Company on appeal. However, the question of due process as far as taxation of companies, such as railroads and pipe-lines, has recently been answered by this Court in the

case of Apache County et al. v. Atchison, Topeka and Santa Fe Railway Company and Southern Pacific Company, decided by this Court on November 13, 1970, 106 Ariz. 356, 476 P.2d 657. Therefore the sole question before this Court is the method of evaluating the pipe-line system, for the purposes of levying taxes by the Department.

Under § 42–124.01, A.R.S. the director of the Department is obliged to make an annual assessment of pipe-lines within the state. He is bound to determine in this assessment the full cash value of the pipe-line systems. Section 42–201, subsec. 7, A.R.S. defines full cash value as follows: "Full cash value for property tax purposes is synonymous with market value which means that estimate of value that is derived annually by the use of standard appraisal methods and techniques". Section 42–147, subsec. B, A.R.S. states that the evaluation approved by the State Board is presumed to be correct and lawful. In the trial court the Company introduced a series of witnesses who testified to a method that the State refers to as "the wasting asset method" which we will develop more fully. On the other hand the State relied upon the Board's evaluation which was based upon the capitalization of income, using the income of the five years prior to the year of evaluation here in question (1968). Primarily the difference between the two systems is that the State relies on past income to capitalize it and project it into the future; whereas, the Company has used the system of projecting the income based upon the through-put of the number of barrels of oil that will be pumped each day to the Los Angeles market up to the year 1980, and then capitalizing and discounting it to bring it back to the year of taxation.

The Company's contention is that the income will be measurably reduced in the future because of several factors which their experts have taken into consideration; that is the claimed declination in production in the Four Corners area and also because the potential of the market in the Los Angeles area is forecast for a reduction because of off-shore oil production and because of the new discoveries of oil off the coast of Alaska, which it is claimed will now find its way down to the Los Angeles market. They also claim that the Texas-New Mexico pipeline, which originates in the same area (Four Corners) but services the midwest will take more and more of the oil production in that area; and that "local usage", which they are obliged to serve first in the Arizona area will continue to increase. Based upon this the Company claims that from the pertinent 1968 date, when the evaluation was fixed for the pipe-line system, that the through-put of the Arizona section of the Four Corners pipe-line will decline from 47,000 barrels per day to 5,000 per day in 1980. On these facts the trial court made a specific finding that the reasonable future expectations for through-put of oil, potential gross revenue, operating expenses, income taxes, and the discount factor set forth by the Company were appropriate and properly set forth the method of computing the present value of the pipe-line.

It is this formula which the State refers to as the "wasting asset" valuation claiming that at the very least it is speculative in that it uses unknown future income, unknown future tariffs, unknown future production; whereas, on the other hand, the State bases its valuation on known factors of what the pipe-line has produced in the prior five years. Basically, the argument comes down to the argument between experts on whether a proper present valuation is more accurately portrayed by using the past five years or by capitalizing the future possible income over a period of twelve years.

Rightly, the State points out that the method being used by the Company has been employed for quite some years by mining companies, whether it be for solid minerals or, for what is known as "fugitive" type of minerals such as oil. But this method when used for the calculation of the valuation of a field, whether it be a mine or an

oil field, can be boxed in and a determination made with some accuracy by experts as to the total projected production be it in barrels or tons of whatever mineral will come out of the field. The State claims that this cannot be used for the transportation industry, which in the case of a pipe-line is no different from a railroad or trucking company, in predicting future income. Granted the through-put of a pipe-line depends in a great measure upon the oil reserves which are found in the area from which it originates; but the method used here by the Company does not rely as much upon the reserves as upon the potential usage by the markets at the termination point of the line.

At the trial over a thousand pages of testimony was recorded based upon the evidence given by the expert geologists and engineers. For example, there was a great deal of testimony by the experts as to the possibility of the Los Angeles Market being utilized by imports from foreign countries; by the production of the Santa Barbara offshore oil wells; testimony as to the losses because of cracks and splits which resulted in the unfortunate ecological problems caused thereby; a good deal of testimony about the potential production of the north and south slope of Alaska, and the new oil finds there; testimony that at the time consumption of oil was approximately 50 barrels per every person in the United States per year. Willard Pye, on behalf of the State, testified that considering our population increase that by 1980 consumption will go up to about 62 barrels of energy per person. He stated that as of 1968, oil and gas produced about 75% of the energy used per person, but by 1980 it will drop to about 70%. The drop will be picked up by atomic or other forms of energy but, although the percentage will drop, consumption of oil itself will increase from 1968's 4.5 billion barrels of oil to about 6.7 billion barrels of oil per year in 1980. All of this points up the problem facing a court in hearing in a trial de novo in a case of this type.

It is true, as pointed out by the Company and agreed to by the State, that the case of State Tax Commission v. Phelps Dodge Corp., 62 Ariz. 320, 157 P.2d 693 gives to the Superior Court full and exclusive right to hear the case from beginning to end; to consider all the evidence and make the same decision as if it were sitting as an expert board of property evaluators. The State has referred to this as a "presumption" that the decision made by the Board, shall be presumed to be correct and lawful, § 42–147 A.R.S., but giving to the court authority to make its own private independent decision. It is on this ground that the State has based its entire case, arguing that the Company came forth in the trial court with a method of evaluation which was not a standard approved method of appraisal and that by presenting evidence of the "wasting asset" method was not a rebuttal of the presumption at all but merely an attempt to substitute an alternate method. Citing § 42–201, subsec. 7 A.R.S. wherein the legislature defined full cash value for property tax purposes as "synonymous with market value, which means that estimate of value that is derived annually by the use of standard appraisal methods and techniques," the State contends that the "wasting asset" method does not fit into a standard appraisal method or technique, and therefore the presumption of validity of the "income capitalization" method used by the Board has not been rebutted.

The Company, as part of its case in the trial court, presented as an expert one Larry Burke who described the appraisal procedures that are, in his opinion, standard appraisal methods and techniques to arrive at a "logical conclusion as to value." In his estimation the quoted portion of the statute—that "market value" is to be estimated by the use of standard appraisal methods and techniques—means to him the same thing as the value that would be arrived at between a willing seller and a willing buyer of the pipe-line. During the course of his testimony he described three approaches in making such an estimate of "market value." Simply, they are a "cost

value" which is described as the reproduction cost of the property, which in this case would be the pipe-line. (None of the 700 miles of real estate through which the pipe-line runs in the State of Arizona is owned by the Company, but is the subject of easements.)

Reproduction cost includes the physical deterioration, functional obsolescence, and economic obsolescence. In describing this, Burke pointed out the difference in the two. Functional obsolescence is inherent in the mechanism itself—the pipe-line—such as the breakdown in the pipe-line or in the machinery used to run it, whereas economic obsolescence is the decrease in value of the pipe-line in servicing those areas for which it was intended to be used. As to the latter we again presumably get back to the question of how much oil would be available between 1968 and the lifetime of the pipe-line, and how much market demand there would be, during this time, at the termination point.

His second approach for evaluation is what can be described as "income"—that is, the value of the present expectation that the property would receive—projected into the future, and he says this is a system or approach that would be best used when appraising property, which is purchased for its potential economic benefit or profit. This approach can be stated as whether a willing buyer would be interested in the economic benefits that he would obtain in the future, not only getting back his original investment, but how much he could expect to make in cash income.

The third approach is "market data" which is a comparable sale of similar property in the same area. Burke makes the point, and rightly so, that such a procedure is useful only where there have been other recent and similar sales in the area. It was pointed out that it is not every day that someone buys or sells a pipe-line of such immense value; that the comparable sale method may be useful in the purchase of a home or business where you could expect that it would change hands over a period of years more than once, so that a seller could expect to sell it in five or ten years and would find a ready buyer; but for pipe-lines this is just not a feasible approach to evaluation.

In support of the testimony of Burke, the Company put on another expert—a Sidney Blaxill—who testified that he agreed with Burke that the three approaches, "cost," "income," and "market data," were the proper ones to use in the appraisal of property. He also supported Burke in the statement that the "cost" approach could not be used properly in the situation as obtained here because a pipe-line which was built in 1958 already has some physical or functional deterioration and economic obsolescence. It was his opinion that in such an instance the obsolescence, whether it be functional or economic, would make the "cost" approach, which includes the replacement or reproduction cost of a similar pipe-line, as not being appropriate. He pointed out that in such situations the economic obsolescence must include consideration of the through-put capacity, and that an appraiser must also take into account the degree of excess capacity; that is, the capacity which a 16-inch pipe-line could produce in the course of one day as compared to what the through-put actually is. In this case, alleging that the through-put capacity of Four Corners is 80,000 barrels per day and steadily declining—averaging in 1968 only 47,000 barrels a day, with the projected prospect that it would produce even less in the future—he rejects this approach to appraisal. He also rejects the market data which is also known as "comparable sales," as testified to by Burke, for the same reasons; that there is a complete absence of market data on the purchase and sale of crude oil pipe-lines in the area. He agrees with Burke that the "income" approach is proper for appraisal.

The "income" approach of course is that referred to as the "wasting assets" method of appraisal by the State. As previously stated, this method turns on the prospective income, plus other speculative elements, which will be set forth hereafter, and then discounting the projected income from the

expected time of the expiration of the usefulness of the pipe-line, year by year, at an arbitrarily-selected discount rate, here twelve per cent. In other words, a dollar receivable one year from now would be worth five per cent (assuming this rate) less had it been received and invested today; but this perhaps can be best explained by the summarization of Blaxill's testimony as set forth in the brief of the Company as follows:

"Mr. Blaxill explained that after the estimate of future income was made, the valuation of the property was arrived at by determining the present worth of each item of income to be received in the future and the present worth of the salvage value remaining when the property ceased to generate income, and adding these amounts together to determine the present worth of all of the economic benefits expected to be received from the property in the future (Tr. 974, line 22, to Tr. 979, line 19). He pointed out that the present worth of the prospect of receiving a dollar five years hence is less than the worth of a dollar in hand today, because if one had the dollar today he could invest it, so that at the end of the five-year period he would have not only the dollar but the return on the investment of that dollar in the meantime; and that therefore the present value of the prospect of receiving the dollar five years hence is determined (1) by the return which could have been realized had the dollar been received presently and (2) the degree of certainty that the dollar will in fact be received (Tr. 974, line 26, to Tr. 975, line 15; Tr. 976, line 9, to Tr. 976, line 10). Mr. Blaxill took care to emphasize that this technique of applying the income approach was the appropriate one in the case of a property expected to produce an income stream with a finite life (such as the income stream to be expected from the Four Corners pipeline, which diminishes to zero in 1980, as shown by Exhibit 42 and by Exhibit 138, lines 4, 5 and (6), as distinguished from what he referred to as an on-going enterprise, i. e., a property which could be expected to produce income indefinitely, with the original capital investment being recoverable at any time in the future by a sale of the property. He reiterated that in the case of a finite income stream such as that being valued in this case the purchaser had not only to realize enough income from the property to give him a fair rate of return on his investment, but also to return his capital to him during the limited revenue-producing life of the property, since there would be no value left in the property after that limited revenue-producing life was over (except for the salvage value) (Tr. 976, lines 9–21, Tr. 985, lines 1–5).

"Mr. Blaxill's application of this discounting - of - future - income - to - present - worth technique precisely reflected Mr. Burke's description of this technique (Tr. 29, lines 9–23)."

The Company proceeded to support the testimony of Burke and Blaxill by several other witnesses, primarily petroleum experts, who testified as to the future production of the area of Four Corners Pipe Line. We will use the summarization set forth in the brief of the Company, since space makes full quotation from the transcript unfeasible. This summarization is as follows:

"The evidence reviewed (in addition to that of Mr. Blaxill, who explained the necessity of relying on experts in such matters as production estimates, marketing matters, and expense projections) is the testimony of the following witnesses:

"MR. WALTER MOODY, a consulting petroleum engineer whose office is in Denver, Colorado, and who is president of Planet Engineers, Inc. Mr. Moody and his organization have prepared for the taxpayer during the past ten years successive estimates of future oil production in the Four Corners area, for taxpayer's use in its business planning. Exhibits 33 and 34 set forth Mr. Moody's conclusions.

"MR. H. J. GRUY, a consulting petroleum and geological engineer whose office is in Dallas, Texas, and who is president of H. J. Gruy and Associates, Incorporated. Mr. Gruy and his organization prepared, and Mr. Gruy gave testimony concerning, an estimate of future oil production in the Four Corners area (Exhibits 43, 44, 128, 129 and 130).

"MR. C. K. MONROE, Senior Tariff and Valuation Representative, Shell Pipe Line Corporation (the contract operator of the Four Corners pipeline), who testified as to the sources of revenue; local refinery demand and market conditions affecting the amount of business available to the pipeline; tariff rates; and salvage value.

"MR. SAMUEL R. EVANS, at the time of trial Senior Staff Adviser, and formerly Manager of Development Economics, Shell Pipe Line Corporation, who testified as to the absence of alternative uses for the pipeline to replace crude oil transportation as a source of revenue.

"MR. ROBERT A. HEVELKA, Financial Analyst Shell Pipe Line Corporation, who testified as to future revenues on the basis of estimated future through-put at the applicable tariff rate, and as to future operating expenses."

Appended to this opinion is a copy of Exhibit No. 138 introduced by the Company in the trial court in which, it alleges, is set forth in one document the complete breakdown on how the entire system of the "wasting asset" method is calculated. As can be noted from this by its calculations the through-put or average barrels per day going through the pipe-line from 1968 is 47,000 per day; by 1970 9,000 barrels a day; and by 1980 a blank which presumably is the expected time of the demise of the pipe-line system; for a total of 130,900,000 barrels over that period of time of through-

put. The Company breaks this down to obtain the gross transportation revenue through 1979. Also projected are the cash operating expenses beginning in 1968 at $1,901,000 a year, and declining, in 1979, to $1,020,000 a year for a total over the period of years of $17,786,000. Eventually this is worked down by using the discount factor, which we previously noted was selected as twelve per cent, to the present worth of the future flow between the years 1968–80 in the amount of $17,932,000 which was rounded off to $18,000,000. This figure is for the entire pipe-line system, of which 45.4 per cent consists of the 700 miles through the State of Arizona. The proportionate amount then comes out to the figure $8,141,128 for the Arizona section. This was the figure eventually accepted as proper by the trial court.

The foregoing excerpts of testimony are not intended to be a re-evaluation by this Court of the testimony given in the court below, but is primarily intended to point out the complexities and difficulties involved when a court attempts to sit, de novo, in place of an expert Board in a trial involving such matters as tax assessments. Not only is a pipe-line involved here, but a method of appraisal (which possibly could be applied to other modes of transportation companies) would obtain approval by judicial fiat in place of the appraisal method sanctioned and utilized by the Board. The legislature established such administrative agencies as part of the legislative scheme of government to make these evaluations based upon their expert opinion. When courts begin sitting de novo on such matters they are then putting themselves in the position of experts in almost every conceivable field of endeavor of government regulation. It is hardly appropriate to expect any single judge to have such expertise.

It is pointed to by the Company, however, and agreed to by the State, that an early decision by this Court in State Tax Comm. v. Phelps Dodge Corp., 62 Ariz. 320, 157 P.2d 693, and § 42–147, A.R.S.

'gives to the trial court the full authority to sit on a tax matter such as this as if it were the original assessing body; that is, the State Department of Property Evaluation. This Court there stated:

"* * * this section [§ 42–147 subsec. C, A.R.S.] requires an independent and original inquiry into the matters of effecting evaluation in that it expressly authorizes the trial court to consider 'evidence of any matters that relate to the full cash value of the property' and directs that 'should the court find that the assessment is excessive, then the court shall find the full cash value of the property, and render judgment for appellant and against the county; * * *' State Tax Commission [of Arizona] v. United Verde Extension Mining Co., 39 Ariz. 136, 4 P.2d 395; State Tax Commission [of Arizona] v. Magma Copper Co., 41 Ariz. 97, 15 P.2d 961."

Unfortunately, the parties to this action misunderstood the function of the Superior Court when it reviews the assessment procedures of the Department, by ascribing to the Phelps Dodge case a holding that the Superior Court has a full measure of jurisdiction of a de novo trial in any and all cases. But that is not what that case said, nor is it what the statute ·says, and it is not in accord with the general rule as set forth in the leading cases. See 84 C.J.S. Taxation §§ 561–562. Phelps Dodge stated only that the court has the authority to independently find the full evaluation of the property *if* it determines that the assessment placed upon it by the proper quasi-judicial board is *excessive*. That is also the wording of the statute. This pre-condition of authority is not an innovation in the law. There are several states which give no jurisdiction whatsoever to the court to correct the determinations of boards of assessment or to substitute its own evaluation, although even in those states, by case law, it is accepted that a court, in the exercise of its equitable jurisdiction, can find that an assessment is inequitable because it is excessive, arbi-

trary, fraudulent, or illegal. 84 C.J.S., supra. For example, in Perez v. Velasquez, 80 N.M. 319, 455 P.2d 185, the New Mexico court adopted the theory from Cooley on Taxation, § 1144, pp. 2299–2300, that values are a matter of opinion:

"* * * and when the law has provided officers upon whom the duty is imposed to make the valuation, it is the opinion of those officers to which the interests of the parties are referred. The court cannot sit in judgment upon their errors, or substitute its own opinion for the conclusions the officers of the law have reached * * *

*     *     *     *     *     *

"It is apparent that the trial court substituted its judgment for that of the taxing authorities and attempted to reassess the property in lieu of the assessment made by the taxing authorities. This it cannot do. In re Blatt, 41 N.M. 269, 67 P.2d 293 (1937); Hardin v. State Tax Commission, 78 N.M. 477, 432 P.2d 833 (1967)."

And in State v. Houser, 138 Tex. 28, 156 S.W.2d 968, the Texas court stated its position as follows:

"Our courts have repeatedly held that the decision of taxing boards in the matter of evaluations are quasi-judicial in nature; and, therefore, in the absence of fraud or other obvious violation of the law, such decisions are not subject to collateral attack. It has also been held that such evaluations will not be set aside merely upon a showing that the same are in fact excessive. If a board fairly and honestly endeavors to fix a just evaluation for taxing purposes, a mistake on its part under such circumstances is not subject to review by the courts. [Citations omitted.]"

Because of the Arizona Statute, as interpreted in the Phelps Dodge case, our trial courts do have more jurisdiction than the courts in those cases referred to above, since our courts are empowered to sit as a

reviewing body of the decisions of the executive boards which make the assessments for ad valorem taxes—but not to the extent urged upon this Court by the Company. As we stated the Phelps Dodge case indicates that the trial court can make its own evaluation where it finds that the assessment made by the Department is excessive. This of course requires a preliminary finding that such is the case as a condition precedent to the court's assumption of jurisdiction to make its own evaluation. In the instant case the entire trial was directed toward a determination of which system—that used by the State, or that urged by the Company—was a better system, and the bulk of the evidence revolved around the sole question of the effectiveness of methodology.

It is the opinion of this Court that the focus of the evidence in the court below should have been directed to the question of whether the method of assessment used by the Department of Property Evaluation was fundamentally unfair, arbitrary, fraudulent, or equitably excessive. In the instant case such a finding is jurisdictional to any consideration of a different system.

In Sheppard v. Atlantic Pipe Line Co. (Tex.Civ.App.), 165 S.W.2d 138, the Court stated:

"The formula attacked as being wrongful was known as the capitalization-of-net-income method. [The same method used by the Department in the instant case]. Under the Elkins Act, as amended, 34 Stat. 587–589, 49 U.S.C.A. § 41, appellee was subject to the jurisdiction of the Interstate Commerce Commission, and a federal court consent decree prohibited appellee from paying after January 1, 1942, to the holding corporation, which owned 99.995% of appellee's stock and which was practically its only customer, more than 7% on the valuation of its property as fixed by the Interstate Commerce Commission".

This is similar to the situation here since a consent decree was imposed by the Interstate Commerce Commission limiting the amount to 7% that Four Corners Pipeline can pay to its owners, who are the sole users. The substance of appellee's contention in the Sheppard case was that the formula used was fundamentally wrong because it took into consideration the *four years past earnings.*

The Court concluded:

" * * * These undisputed facts bring the instant case not only within the rule of the Druesdow case, [Baker v. Druesdow, 263 U.S. 137, 44 S.Ct. 40, 68 L.Ed. 212] but it is similar on principle and facts to the case of Illinois Central R. Co. v. Greene, 242 U.S. 555, 37 S.Ct. 697, 700, 61 L.Ed. 1309, 1316, wherein the court in construing a statute similar to ours held as regards the use of a fundamentally wrong principle or method of calculating value, that: 'the district court properly held that the action of the Board must be sustained unless it was made to appear that they had adopted a fundamentally wrong principle, or had been guilty of fraud. It held further, that no fundamentally wrong principle was involved in determining whether such a railroad system should be valued on the capitalization-of-income or on the stock-and-bond plan; or, if the former, what rate of interest should be used in capitalizing, or how many years earnings should be considered, or what was in fact the amount of net income for a given year: or, if the stock-and-bond plan was adopted, what was the value of the stock and bonds; and that on these and similar matters the action of the Board, in the absence of fraud, was binding upon the court. In this we concur.'"

In the case of Yellowstone Pipe Line Co. v. State Bd. of Equalization, 138 Mont. 603, 358 P.2d 55, cert. den., 366 U.S 917, 81 S.Ct. 1095, 6 L.Ed.2d 241, the court was confronted with the same problem of evaluat-

**520**

ing a pipe-line system and was concerned with one of the methods of assessment, rejected by the Company experts in the instant case, known as the stock-and-bond income cost method of evaluation. Pointing out the problems that confront a trial court when it attempts to inject itself into a case of this type involving a field of expertise normally reserved for a special board of evaluation the court stated:

"This case concerns itself with one of the most complicated and easily misunderstood aspects of taxation in Montana, that is, the assessment of property. Not only this court, but the courts of many other states have been confronted with the problem of judging the legality of assessment procedures."

Then in commenting upon the aspects of the method of assessment used by the Montana state board the court had this to say:

"Turning then to the first issue as heretofore set forth, there exists well-defined principles which serve to guide the review of a decision of the Board of Equalization. It must be borne in mind, that in this discussion we are speaking of the propriety of the method of *assessment* by the Board, as that term has been heretofore defined.

"In the recent case of Treasure State Pipe-Line Co. v. County of Toole, Mont. 1959 [136 Mont. 108], 345 P.2d 162, 164, we said:

'In dealing with plaintiff's contention it may be well to preface our discussion with certain rules and principles with respect to assessment valuations which are well-established in this state. In the early case of Danforth v. Livingston, 23 Mont. 558, 562, 59 P. 916, 917, this court said: "* * * under the great weight of authority, courts will ordinarily not interfere with the action of these officers [assessing officers] to correct mere errors of judg-

ment. It is only where they act fraudulently or maliciously, or the error or mistake is so gross as to be inconsistent with any exercise of honest judgment, that courts will grant relief. * * * Under the authorities cited, this fact [overvaluation], standing alone, is not sufficient to warrant the relief sought. There is not such an excess in the valuation as to justify a conclusive presumption of fraud or malice on the part of the assessing officer. The value of property is a matter of opinion, and there must necessarily be left a wide room for the exercise of this opinion. Absolute accuracy cannot always be attained. Courts cannot be called upon, in every instance, to settle differences of opinion in this regard between the assessing officer and the property owner. Otherwise, courts would be converted into assessing boards, and, in assuming to act as such, would usurp the powers lodged elsewhere by the law-making branch of the government. * * *" ' " Id. at 358 P.2d 69.

The posture of the record in this case is similar to the Yellowstone Pipeline case, supra, in that there is no substantial evidence which would support a finding—nor in fact did the trial court make such finding—that the appraisal method employed by the Department resulted in an excessive assessment or was fundamentally wrong. The State attacked the "wasting asset" method as being speculative but the Company did not counter with evidence that the Department's method was fraudulent, illegal, arbitrary, capricious or inherently unfair—and this is the crux of the matter. It may very well be that the "wasting asset" method is superior to other recognized appraisal methods in certain situations, but it is not the province of the courts to promulgate and implement tax assessment procedures. This is the domain of those Executive Departments which have been created

by the legislature for the specific purpose of carrying out this function. The difficulties in assessing market value even on the simplified version of "willing seller—willing buyer" basis has been well illustrated in an article by E. G. DeGolyer, 1 Institute on Oil and Gas Law 577 (M. Bender & Co. 1949):

"After the technical analysis of the properties resulting in a determination of the volume and rate of production of oil and gas has been made and these data have been reduced to future net revenue, it becomes necessary to establish the market value. The first step is a calculation of the present worth of the future net revenue. This requires the discounting of such future net revenue at prevailing interest rates.

"The market value of a property is not equal to the future net revenue.

"After this computation, which in theory considers the cost of money factor, a willing buyer might well believe that an additional profit should accrue to him for making the investment. This factor may vary widely, because of possible risks involved in the operation of the property and the desires and respective trading abilities of the parties to the transaction. For example, the property may be located in a town lot area and fire hazard may be great. Perhaps the buyer feels that the reserves as represented by the seller are not sufficiently conservative. Perhaps the buyer feels, and remember this is the party to the transaction who is endeavoring to obtain the properties at the lowest possible price, that there will be future declines in price paid for crude oil. He may well have other reasons. In any event, a prospective buyer will want an additional return as a profit margin above the cost of his money. A calculation must therefore be made by the buyer to determine what price he can pay in order to obtain his deserved profit.

\* \* \* \* \* \*

"Present worth is often defined as the future net revenue to be derived from a producing property discounted at some arbitrary discount rate. In this connection it is interesting to note the relatively small importance of future net income which is to be derived in the distant future. For example, the future net revenue of a property netting $1,000 per month for 20 years is $240,000. The present worth of this amount discounted at 10½ percent per year compounded monthly is $102,000. If a similar property produced 25 years at the same rate instead of 20 years, then future net revenue would be increased by 25 percent or to $300,000 but the present worth would be only $105,000 which is representative of an increase of only 3 percent.

"I would like to point out that in spite of all the precise calculations that can be made, the results in reality are only a yardstick in the final negotiations and trading between the two parties. For example, relative income tax rates may play an important part. The relative financial position and relative income tax brackets of the parties to a transaction may be entirely different. The purchaser may have substantial funds or substantial line of easy credit, in which case he may not be interested only in the calculated amount of future income tax liability but also in the relative tax liability of one venture as compared to some other venture.

"More often than not, when two individuals are interested in the purchase or sale of a property, the engineer's appraisal is only a start of trading discussions." Id. at 591–92.

In an early federal case, Union Sulphur Co. v. Reid, 271 F. 978 (D.C.W.D.La.) the company urged upon the court the "Hoover method", which is similar to the "wasting

asset" method, as the proper way to assess mining property. But that court said:

"It is urged that, as during the year 1918 there was taken from the mine 918,-700 tons of sulphur, it was thereafter worth considerably less, and hence that the assessment for 1919 was wholly arbitrary. The valuation of the mine, it is claimed, should not have been based on the past production and profits, but on its expected future production and ability to make profits. Mr. Ingalls, heretofore referred to, placed on the stand by plaintiff, and asked if there were any generally recognized fundamentals or principles of mine valuation, thus succinctly described what is known as the Hoover method, so called because advocated by Mr. Herbert Hoover in a treatise on the subject: * * *

*    *    *    *    *    *

"Mr. Ingalls' plan and principles for valuation are sound in theory, and are probably the best that could be devised as a basis for a sale. One purchasing or selling mining property must look far ahead, and anticipate future events and conditions, and this he must do at his peril, as the price, once fixed and paid, is final. But in the assessment for taxation of such properties the situation is different. The assessor is guided by conditions as they exist at the time of the assessment, and is not required to hazard an opinion on future prices and cost of production which might increase or decrease the value of the property. Assessments are made annually, so from year to year they may be raised or lowered as new conditions may warrant." Id. at 981, 984.

In this case the trial was predicated on a comparison of assessment measures which "placed the cart before the horse" since there was no preliminary finding that the Department's valuation was improper. In the Phelps Dodge case, supra, the tax-payer was able to sustain this burden but the statement of this Court there is significant here:

"The burden was upon the plaintiff company to establish *affirmatively* its contention that the assessment was *excessive*. State Tax Commission of Arizona v. Magma Copper Company, supra, [41 Ariz. 97, 15 P.2d 961]. * * *" [Emphasis supplied]

■ To repeat, it is not the function of the judiciary to promulgate tax assessment regulations in the form of judicial opinions. The court's function in this area of taxation is the same as in the other traditional areas of administrative law; that is to review the actions of such administrative bodies and to super-impose its opinion only in the event that the agency abused its legislatively-delegated duty. This principle was succinctly summarized by an Indiana Court as follows:

"It is generally recognized that a taxpayer is not entitled to relief in this type of litigation simply because the value of his property would be fixed substantially lower if computed by a different method even if the court thought such method to be preferable to the one adopted by the taxing authority, Edison California Stores v. McColgan, Cal.Sup., 1947, 176 P.2d 697; Id., 30 Cal.2d 472, 183 P.2d 16, 22; Southern Ry. Co. v. Watts, 1923, 260 U.S. 519, 527, 43 S.Ct. 192, 67 L.Ed. 375, nor is such taxing authority obliged to use any particular method of valuation or base its valuation on any particular facts if its ultimate action is not fraudulent, capricious or arbitrary. Southern Ry. Co. v. Watts, supra." State Board of T. Com'rs v. Chicago M., St. P. & Pac. R. Co., 121 Ind.App. 302, 96 N.E.2d 279, 283.

■ Since there was no finding by the trial court, nor sufficient evidence introduced to support a finding, that the Department employed an inherently unjust or inequitable method of evaluation, it is the opinion of this Court that the Superior

Court exceeded its jurisdiction in substituting its method of evaluation for that of the Department.

One other question was raised upon appeal, that of costs to the Company, which in view of the foregoing opinion need not be answered.

In view of the foregoing the decision of the Court of Appeals is vacated and the judgment of the Superior Court is reversed and set aside. The matter is remanded and it is ordered that judgment be entered for Appellants.

LOCKWOOD, C. J., and UDALL and HAYS, JJ., concur.

NOTE: Justice STRUCKMEYER did not participate in the determination of this matter.

*Appendix.*

**MORGAN STANLEY & CO.**
FOUR CORNERS PIPE LINE SYSTEM
Certain Calculations With Respect To Willing Purchaser (All Dollar Figures In Thousands)

| | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Assumed Throughput (average barrels per day) | 47,000 | 47,200 | 44,100 | 40,100 | 36,100 | 32,200 | 29,100 | 25,400 | 21,800 | 15,400 | 11,100 | 9,000 | — | 130.9 M barrels① |
| 2. Gross Transportation Revenue | $7,678 | $7,589 | $7,083 | $6,446 | $5,827 | $5,197 | $4,704 | $4,124 | $3,571 | $2,584 | $1,924 | $1,560 | — | $58,287 |
| 3. Cash Operating Expenses | $1,901 | $1,797 | $1,754 | $1,704 | $1,656 | $1,588 | $1,508 | $1,382 | $1,285 | $1,145 | $1,016 | $1,020 | — | $17,786 |
| 4. Net Operating Income before depreciation and tax② | $5,777 | $5,792 | $5,329 | $4,742 | $4,171 | $3,609 | $3,196 | $2,742 | $2,286 | $1,439 | $878 | $540 | — | $40,501 |
| 5. Federal Income Tax Paid | $1,539 | $1,749 | $1,690 | $1,542 | $2,381 | $1,206 | $1,012 | $785 | $557 | $134 | $439 | $270 | — | $12,304 |
| 6. Net To Purchaser | $4,238 | $4,043 | $3,639 | $3,200 | $2,790 | $2,403 | $2,184 | $1,957 | $1,729 | $1,305 | $439 | $270 | $2,100③ | $30,297 |
| 7. Discount Factor④ | .892857 | .797194 | .711780 | .635518 | .567427 | .506631 | .452349 | .403883 | .360610 | .321973 | .287476 | .256675 | .229174 | — |
| 8. Present Worth of Future Flow | $3,784 | $3,223 | $2,590 | $2,033 | $1,583 | $1,217 | $987 | $790 | $623 | $420 | $126 | $69 | $481 | $17,932 |

① Total Throughput
② Line 2 less Line 3
③ Salvage Value
④ Present Worth Value at 12%

Exhibit 138 in trial of Four Corners Pipe Line Company vs. Navajo County, Arizona, et al.